**CONTINENTAL OIL COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

**TIDEWATER OIL COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

**The ATLANTIC REFINING COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

**CITIES SERVICE OIL COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

Nos. 22163, 22867–22869.

United States Court of Appeals
Fifth Circuit.

Dec. 19, 1966.

Rehearing Denied Jan. 27, 1967.

Lloyd F. Thanhouser, Thomas H. Burton, Joseph C. Johnson, Bruce R. Merrill, Houston, Tex., for Continental Oil Co.

Edmund D. Buckley, Los Angeles, Cal., Clyde E. Willbern, Lloyd Armstrong, Houston, Tex., for Tidewater Oil Co.

Bernard A. Foster, Jr., Ross, Marsh & Foster, Washington, D. C., Stuart J. Scott, Dallas, Tex., for Atlantic Refining Co.

Gentry Lee, Cecil C. Cammack, Graydon D. Luthey, R. J. Leithead, Bartlesville, Okl., for Cities Service Oil Co.

Israel Convisser, Atty., Howard E. Wahrenbrock, Sol., Richard A. Solomon, Gen. Counsel., F. P. C., Washington, D. C., for respondent.

James R. Lacey, Newark, N. J., for Public Service Electric & Gas Co., intervenor.

J. Harry Mulhern, Edward S. Kirby, Newark, N. J., for Public Service Electric & Gas Co., Intervenor.

Before WISDOM and COLEMAN, Circuit Judges, and DAWKINS, District Judge.

WISDOM, Circuit Judge.

Petitioners, the four Catco companies, seek review of Federal Power Commission orders. The basic question is wheth--er the petitioners' transfer, in the form of lease-sale agreements, of certain leasehold interests in the offshore Ship Shoal

Field is a sale of natural gas in interstate commerce within the meaning of Section 1(b) of the Natural Gas Act.[1] United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (*Rayne Field* case), upholding the Commission's ruling that it has jurisdiction over/a leasehold purchase arrangement controls this case. We find that the transfer is subject to the Commission's jurisdiction. We affirm the Commission's order requiring certification under Section 7 of the Act.

\* \* \*

Petitioners, the four Catco companies, have jointly developed leasehold interests in the Ship Shoal area offshore Louisiana obtained for $11,562,017 from the United States government in 1955 under the Outer Continental Shelf Lands Act. On May 10, 1961, by Acts of Sale and Mortgage and Pledge they conveyed these leaseholds to the Tennessee Gas Supply Company and the Tenneco Oil Company, two subsidiaries of the Tennessee Gas Transmission Company, a major interstate pipeline company.[2] The total consideration was $97,333,333 in cash and notes maturing over 15½ years.

The Commission first considered the Ship Shoal transfer in connection with Tennessee Gas Transmission's 1961 application for certification of an $8.5 million connecting pipeline.[3] Tennessee stated during the course of the proceeding:

> The sole purpose for acquiring the leasehold interests in the Ship Shoal Field was to provide additional reserves and deliverability to meet the natural gas requirements of Tennessee's jurisdictional customers. 30 FPC at 765.

The Catco companies were not parties to the Tennessee proceeding and made no filings with respect to Ship Shoal. The Commission concluded that it could not certify the construction of the pipeline unless it had jurisdiction over the leasehold transfer.[4] Accordingly, the Commission issued the order here on review for petitioners to show cause why their transfer of the Ship Shoal leasehold interests should not be certified under the Act. Tennessee intervened in the resulting FPC hearings and in this appeal. Its application for the Ship Shoal connecting lines has been deferred pending final resolution of the Catco jurisdiction issue now before us.

The examiner found that Catco had drilled seventeen wells in the Ship Shoal Field between acquisition of the leaseholds in 1955 and May 3, 1960. Seven were completed as oil wells and one as a gas well. The gas well was shut-in and

1. 15 U.S.C. § 717(b): "The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

2. Negotiations for the Ship Shoal sale had taken place between petitioners and Tennessee Gas Transmission Company. However, the formal instruments effectuating the transaction were executed by Catco and the two subsidiaries of the pipeline, Tennessee Gas Supply Company and Tenneco Oil Company. The gas in-terests in the leasehold were thereafter assigned to the parent pipeline. This rather complicated arrangement was similar to that employed in the *Rayne Field* transaction; it allowed the parent pipeline company to avoid giving a mortgage on the Ship Shoal Properties which would have encumbered its own assets.

3. Tennessee Gas Transmission Co., Opinion No. 403, 30 F.P.C. 759 (1963).

4. On the basis of the record, the examiner in the *Tennessee* proceeding held that the Ship Shoal transaction involved a sale of natural gas for resale in interstate commerce which was not in the public interest. By Tennessee's own estimate the gas would cost it 28.3 cents per Mcf over a 26 year production period as compared with the area ceiling of 19.5 cents per Mcf. Id., Second Decision of Presiding Examiner, 30 F.P.C. at 801–09, 819–21.

no gas has been produced. The evidence showed seventeen completions in the oil wells and two in the gas well. Gas was found in 46 reservoirs in 39 distinct sand zones and oil in fourteen reservoirs in eight distinct sand zones. In addition five reservoir sands that produced oil were also productive of gas. Later, drilling on five potential gas wells was commenced but completion was deferred. Production of oil began and the oil was barged inland. The gas well was not hooked up, since Tennessee's application for a pipeline certificate has been deferred.

In 1960 petitioners sought and received several offers for Ship Shoal in the form of both conventional gas purchases and purchases of leasehold interests. Tennessee made offers in both forms. The petitioners chose Tennessee's leasehold purchase offer largely because it produced the greatest discounted net cash flow. Under the Lease Sale Agreement, the four Catco companies each received one-fourth of the total $97⅓ million consideration, $3.1 million in cash and the remainder in notes. The notes are in two series designated "O" and "G", both of them the obligation of Tennessee Gas Supply. One series (the "O" series) is also the obligation of Tenneco, which owns and operates all of Tennessee's domestic oil producing properties. Thus Tenneco's total payment was $12 million ($387,500 cash and remainder in "O" series notes); Gas Supply's was $85⅓ million ($2,712,500 cash and remainder in "G" series notes). The buyers and sellers agreed for purposes of establishing the rights of the parties, that the total quantity of *recoverable reserves* of gas attributable to the leasehold interests was 533,333,333 Mcf and the total quantity of recoverable oil 12,244,898 barrels. This stipulation was partly for the purpose of establishing security. These figures were also used to arrive at comparison levels and unit prices for the redetermination provisions of the agreements. The redetermination provisions, common in leasehold sales, provide for recomputation of the total price, at the request of

any party, during the seventh year following the signing of the agreements. In such event, the recoverable quantities of oil and gas would be redetermined by arbitration proceedings. And the amounts by which the estimates of recoverable reserves were changed above or below 533,333,333 Mcf of gas and 12,244,898 barrels of oil would result in an adjustment in the total purchase price of 16 cents per Mcf ($85⅓ million/533,333,333) and 98 cents per barrel ($12 million/12,244,898) above or below those base quantities. The examiner credited testimony that the base quantities represented only an arbitrary present determination of reserves arrived at by negotiation. They are not the average of actual engineering estimates obtained by parties to the transaction. Indeed the figure agreed upon is lower than any actual estimate mentioned in the hearings.

The Ship Shoal lease sale transferred to Tennessee's subsidiaries all mineral rights down to the base of the MI sand, including rights to produce and sell oil, casinghead gas, gas, condensate, and natural gas liquids, as well as related equipment. The Catco companies retained no responsibility for the management or operation of the interests. However, Tennessee was given the option to require petitioners to purchase all the crude oil to be produced from the properties at the average price posted in nine South Louisiana fields. Tennessee insisted on the oil purchase provision to assure a market for the oil since Tennessee itself is not in the oil business. This option has been continuously exercised since 1962. The note installments are being paid on schedule.

The examiner found that the Ship Shoal transaction, therefore, was a "sale of natural gas for ultimate public consumption within the meaning of the Natural Gas Act.": "This record shows the transfer of a vast reserve of natural gas, located outside the boundaries of any State, into the hands of a pipeline company whose business is the transportation and sale of natural gas within the United States. * * *" But the

examiner concluded that the Commission lacked jurisdiction because of this court's opinion in the *Rayne Field* case[5] that leasehold transactions generally were exempt under Section 1(b) exempting "the production and gathering of natural gas." The Commission adopted the examiner's findings except for his conclusion, which it reversed pending review of the *Rayne Field* case in the Supreme Court. The Supreme Court's *Rayne* decision in favor of jurisdiction came six months later. Thus, the Commission findings before us in Ship Shoal do not reflect the Court's *Rayne* opinion. However, they do provide a sufficient basis for our application of the standards the Court announced in that case.

The Commission order under review directs the petitioners to file, within six months, appropriate rate schedules and applications for certificates and to take other steps necessary to bring the Ship Shoal transfer within the requirements of the Act.[6] However, it should be noted that no questions are before us relating to the propriety of the Commission's disposition of the case following its assertion of jurisdiction. Before us is only the jurisdictional question. Compare *Rayne,* supra, 381 U.S. at 399, 85 S.Ct. 1517.

The petitioners concede that there is no dispute regarding the relevant facts. However, they contend that the Commission made a number of ultimate findings not supported by substantial evidence.

## I.

The *Rayne Field* case is the most recent link in the chain of Supreme Court decisions defining the Commission's jurisdiction over wellhead sales by independent producers. The chain began, of course, with Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. Since the *Catco* case (Atlantic Refining Co. v. Public Service Commission of State of New

York, 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312), the Commission has attempted to hold producers to prices "in line" with similar sales. But until *Rayne* one class of gas transfer had eluded the Commission's jurisdiction: the transfer of leasehold interests in developed fields. The obstacle to Commission regulation of these leasehold transfers was Federal Power Commission v. Panhandle Eastern Pipeline Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499. In that case the Court stated flatly, "Of course leases are an essential part of production", 337 U.S. at 505, 69 S.Ct. at 1256, 93 L.Ed. at 1505, and therefore fall under the Section 1(b) "production and gathering" exemption.

In *Rayne* the Court construed the "production and gathering" exemption as applicable to "state regulatory power over the physical processes of production or gathering in furtherance of conservation or other legitimate state concerns", but not to sales of the kind "affirmatively subjected" to Commission jurisdiction. 381 U.S. at 403, 85 S.Ct. 1517. In effect, the Court broke down the sharp distinction between the conventional sale of wellhead gas and the sale of leasehold interests that had prevailed since *Panhandle.* Under *Rayne,* the lease transfer is no longer to be arbitrarily excluded, purely as a matter of form, from Commission jurisdiction. The test is not whether the transaction in question is in form a lease-sale or a sale of gas. The transaction may be a lease-sale in accordance with local law and a sale of gas under the Act. "Without impugning in any way the good faith and genuineness of the transactions, we think it clear that the lease-sales here in question can nonetheless be considered 'sales' of natural gas in interstate commerce for purposes of the Act." 381 U.S. at 400, 85 S.Ct. at 1522. The Court directed a case-by-case analysis of

5. Marr v. Federal Power Comm., 5 Cir. 1964, 336 F.2d 320, rev'd sub. nom. United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466. See 44 Texas L.Rev. 356 (1965).

6. The Catco companies filed petitions for review and stay of the orders in the Fifth, Ninth, Tenth and District of Columbia circuits. These orders were granted, and review proceedings were consolidated in this court for all petitioners.

the substance of each transfer. The test is three-pronged:

(1) Is the economic effect of the transfer similar to that of a conventional sale?

(2) Is the subject of the transaction "proven and substantially developed" reserves?

(3) Is the transfer of the reserves for purpose of interstate transmission and resale?

The Court made it clear that the economic effect on the parties could deviate somewhat from conventional sales. The fundamental inquiry is whether "the sales of these leases in * * * a proven and substantially developed field * * * accomplished the transfer of large amounts of natural gas to an interstate pipeline company for resale in other *States. That is the significant and determinative economic fact.*" (Emphasis added.) 381 U.S. at 401, 85 S.Ct. at 1522. Employing this case-by-case approach, the Court distinguished *Panhandle,* where the leases were undeveloped and the sale was in *intra*state commerce. In a summary opinion based on *Rayne* the Court has also affirmed Commission jurisdiction over transfer of the Bastian Bay Field leases. Federal Power Commission v. Pan American Petroleum Corp., 1965, 381 U.S. 762, 85 S.Ct. 1802, 14 L.Ed.2d 714, rev'g 10 Cir. 1964, 339 F.2d 694, rev'g 30 F.P.C. 1477 (1963).

## II.

The petitioners contend that the Ship Shoal transaction is sufficiently different in economic effect from *Rayne* to preclude its characterization as a jurisdictional sale.

A. The Ship Shoal assignment, they contend, was not a substitute for a conventional sale of gas, as the lease transfer was in *Rayne.* In *Rayne* the sellers first executed conventional sale contracts, but later withdrew their application for certification when it appeared that, because of the *Catco* case,[7] the Commission might not approve the application. Here the petitioners requested several prospective purchasers to make an offer for the leases and, alternatively, an offer for a conventional purchase of gas. The plan was to obtain "a basis for economic comparison" between the two different types of sales. Present value was the common denominator. The chief objective was the highest possible discounted net cash flow. Analysis showed that the discounted net cash flow for a Catco company from 22 years of continuous operations would be $7,449,000; but that from a lease sale to Tennessee it would be $8,598,000 payable in only 16 years. We do not find this a significant difference between the two plans. The Supreme Court had the same distinction open to it in *Rayne,* which also involved a 16-year note repayment plan. The difference in economic effect between the two figures of net cash flow is principally that between similar earnings discounted over 16 years and 22 years. It goes more to the method of payment than to the substantial economic effect of the transfer.

B. The Ship Shoal assignment, petitioners argue, is distinguished from the *Rayne* transaction by the transfer of all mineral interests and control to the buyer. In *Rayne,* the Court noted that the lease-sales were to cover no minerals except natural gas and condensate, all other mineral rights being reserved to the lease-sellers. By a management agreement one of the sellers was to continue the bulk of production work. The Ship Shoal lease agreement, however, transferred all the leasehold interests including the right to produce and sell oil, casinghead, condensate, and natural gas liquids. The petitioners retained no role in the control or management of the properties conveyed. But these differences between the two transactions are blurred by related similarities. Although the Ship Shoal agreement transferred both gas and oil rights, Tennessee has repeat-

7. Public Service Comm. of State of New York v. Federal Power Comm., 3 Cir. 1958, 257 F.2d 717, aff'd sub nom. Atlantic Refining Co. v. Public Service Comm. of State of New York, 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312.

edly sought to purchase the oil leaseholds if the Catco companies would continue to develop and operate them or, alternatively, that Tennessee would take back the oil extracted by Tennessee at a mutually agreeable short point. In the final agreement the petitioners gave Tennessee the option to require Catco to purchase crude oil produced from the properties at the average posted price. As stated by one witness for Catco, "Tennessee was not in the oil business although it was affiliated with a company [Tenneco] that was. Tennessee insisted on assurance that it would have a market for the crude and receive for it the price current at the time of production."[8] In exercise of the option Tennessee has sold back to Catco virtually all oil taken from Ship Shoal. This may not be a "wash sale" in the usual sense, but it is clear that Catco's obligation to repurchase the crude oil represents a significant retained interest in Ship Shoal. The petitioners assumed the functions and risks of refining and marketing the Ship Shoal oil.

Similarly, the differences in control and management between the *Rayne* and Ship Shoal arrangements is not substantial enough to defeat jurisdiction. The buyer in *Rayne*, even though without operational responsibility, still enjoyed the right to make major production decisions such as determining the volume of gas to nominate for production each month and whether new wells should be drilled.[9] In Ship Shoal, the buyer takes the operational responsibility along with the important policy decisions. Ship Shoal in this respect is similar to the *Bastian Bay* transaction over which the Court affirmed FPC jurisdiction. Tennessee in that case also was to operate and to complete development of the field.[10]

C. Indeed we perceive numerous identities between Ship Shoal and the two lease-sale transactions ruled on by the Supreme Court. The payment for the Ship Shoal leases, as in Rayne, is represented by notes spread over a 16-year period, and the notes have an acceleration clause geared to production, apparently as a security device. And an intermediate corporate structure shields the pipeline company from principal obligation on the notes to the producers. And as in *Bastian Bay*, the Ship Shoal agreement provides for a redetermination of the gas reserves at a future period.

We conclude that here, as in *Rayne* and *Bastian Bay*, the economic effect of the transfer does not differ enough from a conventional sale to defeat Commission jurisdiction.

### III.

The petitioners contend that the Ship Shoal gas reserves do not meet *Rayne's* "proven and substantially developed" test. There was little question on appeal that *Rayne* was a proven and substantially developed field. Thus the Court felt no need to spell out this standard in that case. It justified the test with this rationale:

"The substantiality of development is a relevant consideration, for the more that must be done before the gas begins its interstate journey, the less the transaction resembles the conventional wellhead sale of natural gas in interstate commerce * * *."[11]

The Supreme Court did not say that such proof of substantiality is the only consideration. Starting with that rationale, however, we conceive the applicable standard to be as follows: Have the leaseholds been sufficiently proved and developed for imminent production of

---

**8.** The Crude Oil Purchase recited:
"*A principal condition of Seller and moving consideration to Seller* in entering into such lease acquisition transaction is this agreement on the part of Buyer to purchase the quantities of crude oil produced from said leases which Seller hereby is granted the right to sell to Buyer and Buyer hereby agrees to purchase." (Emphasis added.)

**9.** 381 U.S. at 396 & n. 4, 85 S.Ct. at 1520, 14 L.Ed.2d at 469.

**10.** 30 F.P.C. at 1482, 1490, 1504.

**11.** 381 U.S. at 403, 85 S.Ct. at 1524, 14 L.Ed.2d at 474.

natural gas in commercial quantities? Two criteria emerge from this standard. One is definability of gas volume based upon proof of reserves; the other is imminent ability to produce in commercial quantities. The Commission did not direct its findings expressly to these issues since, as we have noted, its opinion preceded that in *Rayne*. However, the Commission did make numerous findings, supported by substantial evidence and elaborated in its brief, to justify our holding that the Ship Shoal leaseholds were "proven and substantially developed."

Tested under the "proven and substantially developed" criteria, as we conceive them, both *Rayne* and *Bastian Bay* fields deserve a high rating. In *Rayne Field*, 19 wells were in the ground, and 7 more were to be drilled.[12] Natural gas would and did begin to flow in commercial quantities into the buyer's system immediately upon completion of its connection with the field.[13] Although there was controversy at the hearing level over the extent of the Rayne reserves, the Commission found them to be of "substantial size." Total estimated recoverable reserves were about 990,000 Mmcf.[14] There was further evidence of possible additional reserves in the Rayne untested sands. The Commission considered Rayne a "fully developed" field.[15] The situation

was similar at *Bastian Bay*. The seller had drilled 32 wells and achieved 21 oil completions and 20 gas completions. The field had fifteen gas wells and five oil and gas wells, either wholly or partially subject to the transferred leases, which were promptly connected to the buyer's collection system.[16] Commercial quantities of natural gas began to flow into the buyer's lines at the time of the connection.[17] The parties stipulated in the lease sale agreement that recoverable reserves of gas transferred were 759,350,-000 Mcf. Although the buyer in *Bastian Bay,* also Tennessee, was able to complete the development of the field, there apparently was no controversy that it was extensively developed at the time of the sale.[18]

Ship Shoal obviously was not as extensively developed as were *Rayne* and *Bastian Bay* Fields; it had only one gas well compared with nineteen and fifteen respectively in the other two fields. But "even though a sale of natural gas in interstate commerce occurs before production or gathering is ended, it is nonetheless subject to regulation". *Phillips* 347 U.S. at 402, 85 S.Ct. at 523. We conclude that Ship Shoal had reached the stage of proof and development necessary to satisfy the *Rayne* criteria.

A. Tennessee's faith in the amount of Ship Shoal reserves destined for inter-

---

12. 381 U.S. at 396 & n. 3, 85 S.Ct. at 1520, 14 L.Ed.2d at 469. The Court and opinions below did not state whether all of these were gas wells, but we will assume they were. Nor do the opinions state whether these wells were drilled at the time of the sale or not until the 1963 show cause hearing. Texas Eastern Transmission Corp., Opinion No. 378, 29 F.P.C. 249, 264-65 (1963).

13. Texas Eastern constructed and connected its facilities to *Rayne Field* in the time between a Commission certification order and its reversal by the District of Columbia Court of Appeals. Between the date the facilities were placed in operation and January 1, 1961 (less than a year), Texas Eastern took approximately 65,000 Mcf of natural gas from Rayne Field into its interstate system. See Texas Eastern Transmission Corp., supra, Note 12 at 264.

14. Texas Eastern Transmission Corp., Opinion No. 378, 29 F.P.C. at 251 (1963).

15. Texas Eastern Transmission Corp. (G-12446), 21 F.P.C. 860, 861 (1959).

16. Tennessee Gas Transmission Co., Opinion No. 413, 30 F.P.C. 1477, 1493 (1963).

17. Tennessee installed a 2.63 mile line to Bastian Bay under a budget-type authorization before the Commission asserted jurisdiction over the lease-sale. At the time of the hearing for a regular § 7 authorization, production from Tennessee's Bastian Bay reserves was about 40,000–50,000 Mcf per day; this was about 1½ years after Tennessee connected its line to the field. Tennessee Gas Transmission Co., Opinion No. 413, 30 F.P.C. 1477, 1479, 1502 (1963).

18. See Id. at 1504.

state consumption indicates that the field had at least been developed to the point where a reasonable estimate could be made as to the available reserves. Ship Shoal was a bargained transaction among corporations with vast experience, not only in the petroleum business, but also in the Louisiana fields. The prospective buyer, Tennessee, as might be expected, asserted throughout the negotiations the lowest estimate of net recoverable reserves. Tennessee's estimate was 530,000 Mmcf. The prospective sellers' estimates ranged from about 730,000 to 823,000 Mmcf. Even at the time of closing, there remained a wide variance in reserve estimates among the parties for the purpose of setting the total price. In the end, however, Tennessee was willing to invest over $97 million on its faith in the lowest of the reserve estimates, 530,000 Mmcf., subject to a redetermination provision similar to that used in *Bastian Bay*. And Tennessee applied forthwith to the Commission for transmission certificates based on an estimate of 533,402,000 Mcf in available reserves.[19]

We recognize that estimates of reserves in Ship Shoal may vary considerably until the field is fully drilled and there is productive history over a period of years under operating conditions. But Catco has conceded that a definite and definable volume of gas cannot be determined down to the last cubic foot even after a well has been fully depleted. One can make only estimates of gas. There are some producing areas where it is possible to estimate recoverable reserves with a high degree of accuracy although the particular leases are undrilled and undeveloped. In offshore fields and in South Louisiana, however, reserve estimates are more difficult to determine even after full development because of multiple formations and faulted reservoirs. The effect of redetermination pro-

vision is to negate or to diminish substantially the shifting of the risk relating to gas deliverability from the petitioners to Tennessee. We conclude that the recoverable reserves in Ship Shoal field were sufficiently definable to satisfy the *Rayne-Bastian Bay* requirement of proof. The Commission's findings in this regard are supported by substantial evidence.

B. Similarly, Tennessee's readiness to connect its lines to Ship Shoal is a strong indication that the field was "substantially developed" at the time of transfer. Tennessee relied heavily on the Ship Shoal reserves in support of its 1960–62 applications for expanded pipeline facilities.[20] It was aware that in comparable situations the Commission generally grants authorization on the condition facilities will be constructed and placed in actual operation within one year of certification.[21] Tennessee estimated that its Ship Shoal operations could begin in 1963, with first-year gas operating and maintenance expense of $853,400 (no well-work over expense) and similar expense of over $1.3 million per year for the next 16 years.[22] The presiding examiner in the 1963 *Tennessee* proceeding concluded that the Ship Shoal gas had been "ready for action since 1960, can be and should be connected without further delay," but for the unresolved *Catco* jurisdictional question and related procedural issues. He agreed that the Ship Shoal gas, the "adequacy of its reserves *and deliverability*," was essential to support Tennessee's 1960–62 applications for increased service.[23]

The Catco witnesses in the present proceeding did not refute the evidence of Ship Shoal's imminent ability to produce gas in commercial quantities. Cf. Continental Oil Company v. Federal Power Commission, 5 Cir. 1957, 247 F.2d 904, 907. It appears that two completions

19. Tennessee Gas Transmission Co., Opinion No. 403, 30 F.P.C. 759, 762 (1963).

20. Id. at 765.

21. Id. at 770. See F.P.C.Reg. § 157.20 (b), as amended (1957).

22. Tennessee Gas Transmission Co., supra note 19, Second Initial Decision of Presiding Examiner, 30 F.P.C. at 803.

23. Id. at 798.

in one gas well could have been piped up and produced immediately, although the five deferred wells would need further development by Tennessee. Catco conceded that it could have taken certain steps leading to the production of one or more of the wells. Further, a Catco expert estimated that once production began, as much as 10 per cent of the reserves could be extracted in less than four years.

It may well be that Ship Shoal is a "long way" from being fully developed. Catco anticipated that from 34 to 40 additional completions would be necessary to calculate the final consideration in the seventh year redetermination of reserves. But this problem relates more to determination of final consideration, than to imminent ability for production. The "substantial and determinative economic fact" is that Catco transferred a large volume of natural gas, definable within a range of reliable engineering estimates, to a jurisdictional pipeline company for imminent interstate transmission. The Commission's findings, supported by substantial evidence, lead us to the conclusion that Ship Shoal was "proven and substantially developed" under the standards of *Rayne* and *Bastian Bay.*

### IV.

■ We see no merit in petitioners' contention that the Ship Shoal transfer was not a sale in interstate commerce.[24] Tennessee, an intervenor in these proceedings, has shown an unequivocal intention to connect Ship Shoal to its interstate transmission system. Its application to expend $8.5 million for a connecting line remains pending; it was deferred only until settlement of the Commission's jurisdiction over the underlying transfer. Moreover, the Ship Shoal field *is located outside the borders of any state and any gas taken will have to be transported across state lines for sale* within the United States. The petitioners do not deny the truth of these jurisdictional facts, and they have not offered any evidence to show that the Ship Shoal gas is not destined for ultimate public consumption in other states when Tennessee completes its planned transmission facilities. See Continental Oil Company v. Federal Power Commission, 5 Cir. 1957, 247 F.2d 904, 907.

■ The petitioners contend also that Tennessee remained free even to reject a proferred certificate to connect with its $85⅓ million Ship Shoal reserves. But the Commission cannot decline jurisdiction of a gas sale on the mere possibility that the buyer may eventually reject Commission authorization of the connecting line. Tennessee has already paid millions of dollars for the leasehold, is continuing to make regular payments toward the total price of $85 million, and its application to transport Ship Shoal gas in interstate commerce is pending. Similarly, the Commission cannot abstain from exercising jurisdiction of petitioners' sales on that basis. See Atlantic Refining Co. v. Public Service Commission of State of New York, 1959, 360 U.S. 378, 387, 79 S.Ct. 1246, 3 L.Ed.2d 1312, 1318.

The Ship Shoal transaction may be distinguished from *Panhandle* in the same way as *Rayne:* The Ship Shoal leases were developed and the sale of the natural gas was in interstate commerce.

### V.

■ Petitioners further assert that the Outer Continental Shelf Lands Act of 1953 [25] (OCSLA) precludes classification of the Ship Shoal transfer as a Gas Act sale. The Ship Shoal leases, unlike those in *Rayne* and *Bastian Bay,* were originally granted by the United States through the Department of the Interior under

---

24. Section 2(7) of the Natural Gas Act, 15 U.S.C. § 717a(7), defines interstate commerce as follows:
   " 'Interstate commerce' means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place thereof, but only insofar as such commerce takes place within the United States."

25. 43 U.S.C. §§ 1331–1343.

the OCSLA. Section 4(a) (1) of the OCSLA provides that "mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this Act."[26] And Section 4(a) (2) makes the laws of the adjacent state (here Louisiana) federal law for the outer Continental Shelf "[t]o the extent that they are applicable and not inconsistent with this Act or with other Federal laws and regulations of the Secretary [of Interior]."[27] As petitioners read these provisions, Louisiana law determines, as a matter of federal law, whether a particular instrument constitutes an assignment of a lease or a sale of hydrocarbons. The catch is that Louisiana does not recognize a sale of gas in place. Frost-Johnson Lumber Co. v. Salling's Heirs, 1923, 150 La. 756, 91 So. 207; La.Rev.Stat. Tit. 9, § 1105; La.Code of Civ.Proc., Art. 3664. This feature of Louisiana law did not frustrate the Supreme Court in *Rayne*. Presented with a conflict between federal and state law, the Court refused to allow the Gas Act to be "hamstrung" by "technical concepts of local law." 381 U.S. at 400 and n. 7, 85 S.Ct. at 1522, 14 L.Ed.2d at 472.

In this case the petitioners frame the conflict as one between two federal statutes—the Gas Act on the one hand and Louisiana law applied through the OCSLA on the other. This view of the OCSLA overlooks the express statutory exception to application of state law. Louisiana laws would apply under OCSLA § 4(a) (2) only "[t]o the extent * * * *not inconsistent with* * * * other Federal laws". The Supreme Court has already held in *Rayne* that Louisiana's failure to recognize the sale of gas in place is inconsistent with application of the Gas Act. Louisiana's characterization of the Ship Shoal transaction, to the extent it conflicts with the Gas Act definition of the transaction, is inapplicable.

This result is fully consistent with the respective purposes of the OCSLA and the Gas Act. Congress passed the OCSLA solely to regulate the "leasing and development * * * of the oil potential of the Continental Shelf." H. R.Rep.No.413, 83d Cong., 1st Sess. 2–3 (1953), 2 U.S.Code Cong. & Ad.News p. 2178 (1953). The OCSLA makes no provision for the regulation of gas sales of independent producers.[28] In contrast, "[p]rotection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act," Phillips Petroleum Co. v. State of Wisconsin, supra, 347 U.S. at 685, 74 S.Ct. at 800. The "congressional intent [was] to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce". Id. 347 U.S. at 682, 74 S.Ct. at 799. The plain meaning and legislative history of the statutes show, at least in this case, that the OCSLA and the Gas Act must be applied reciprocally in furtherance of their individual regulatory purposes.

* * *

The crucial fact here, as in *Rayne,* is that the assignment of the leases accomplished the transfer of large amounts of substantially proven off-shore natural gas reserves to an interstate pipeline company for eventual resale in interstate commerce. The transaction was a sale of a definable volume of gas, the price of which was geared to the actual volume found, and payment for which was directly related to its production—even if there has also been a transfer of an interest in real property. If such sales were not subject to Commission regulation, an "attractive gap" in the regulatory system would be created, and the producing states would be unable to close it. People of State of California v. LoVaca Gathering Co., 1964, 379 U.S. 366, 369–371, 85 S.Ct. 486, 13 L.Ed.2d 357. Since only the jurisdictional issue

---

26. 67 Stat. 462 (1953), 43 U.S.C. § 1333 (a) (1).

27. 67 Stat. 462 (1953), 43 U.S.C. § 1333 (a) (2).

28. The *Phillips* decision in 1954, extending FPC jurisdiction to independent producer sales, did not come until one year after passage of the OCSLA.

is before us in this proceeding, we simply affirm the Commission's order directing the petitioners to make filings and take other steps necessary to comply with the provisions of the Natural Gas Act.

The order is affirmed.