PUBLIC SERVICE COMMISSION OF
the STATE OF NEW YORK,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,* Respondent,

Pennzoil Producing Co., Intervenor.

No. 76–1352.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 30, 1977.

Decided Sept. 28, 1978.

Robb, Circuit Judge, dissented and filed opinion.

---

\* This case may be cited as *Public Service Commission of New York v. Federal Energy Regulatory Commission* [Optional Certificates II].

**544**

Richard A. Solomon, Washington, D. C., with whom Peter H. Schiff, Gen. Counsel, Public Service Commission of State of N. Y., Albany, N. Y., was on the brief, for petitioner.

Allen M. Garten, Atty., Federal Energy Regulatory Com., Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., Federal Energy Regulatory Com., Washington, D. C., were on the brief, for respondent.

Alvin M. Owsley, Jr., Houston, Tex., with whom Jeron Stevens and John M. Young, Houston, Tex., were on the brief, for intervenor.

Before BAZELON, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

Dissenting opinion filed by Circuit Judge ROBB.

LEVENTHAL, Circuit Judge:

In this case we review an order of the Federal Power Commission (FPC). The order is one that approves a certificate for a natural gas producer under the optional certificate program. As indicated, we vacate the order and remand for further consideration by the FPC's successor, the Federal Energy Regulatory Commission (FERC).[1]

### AN OVERVIEW

Since our discussion of issues must, of necessity, be technical and extended, we provide a preliminary sketch of this opinion's highlights.

The FPC has developed a number of regulatory programs aimed at alleviating the natural gas shortage. Starting in 1972, the FPC developed the program involved here, the optional certification program. Optional certification gave producers favorable procedures and rate standards as an incentive to increase their exploration and development of new gas sources. In 1974, we upheld the program's procedures. We remanded the program's rate standard, which had used a "test year" basis instead of the requisite actual cost data.[2]

1. The Federal Energy Regulatory Commission was created by § 401 the Department of Energy Organization Act of 1977, 42 U.S.C.A. § 7171 (West 1977). The act provided that appeals taken prior to the statute were to continue as though it had not been enacted. Id. § 705(c), 42 42 U.S.C.A. § 7295(c) (West 1977). The events involved in this appeal occurred prior to passage of the act. For convenience we refer to the Federal Power Commission as the agency under review. At points where the 1977 Act has affected our discussion we have noted its impact.

2. *Moss v. FPC,* 164 U.S.App.D.C. 1, 502 F.2d 461 (1974), *cert. denied in part,* 422 U.S. 1020, 95 S.Ct. 2627, 45 L.Ed.2d 668 (1975), *rev'd in part,* 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976); *Consumers Union of U. S., Inc. v. FPC,* 166 U.S.App.D.C. 276, 510 F.2d 656 (1974).

Without adequate explanation, the FPC has adopted an optional certification standard under which it will approve rates that return to producers the total cost of gas projects. We find that standard incompatible in several respects with its asserted aim of increasing exploration and development. The chief problem is that the standard is not coordinated with the FPC's main ratemaking procedure, its national ratemaking. National ratemaking already takes care of high cost projects; producers are reimbursed for such projects by their inclusion in the national average cost base. Optional certification would reimburse producers a second time, directly, for the same high cost projects, without any coordination with national ratemaking. There is thus a plain risk of "double counting"—billing consumers twice for the same high costs. It may be that the FPC has authority to permit such a double burden on consumers as a reasonable exercise of discretion, but it must at a minimum show there is a deliberate exercise of discretion, by identifying the problem, and its reasons for its approach. This it has not done.

The allowance of some of the costs now included in the "total cost" standard would simply bail out high cost projects. This means a windfall rather than an incentive as to existing projects with costs already sunk. We note that part of the producer's total costs in this case were spent in the 1960's, long before this optional certification program was envisioned. If there is a justification as to existing projects, it has not been advanced by the Commission. A different objection arises as to the provision for new projects whereby outlays to bid on offshore leases are included in total costs. This may give producers an incentive to bid

higher for lease acreage. However, insofar as acreage would be leased anyway (at lower bids), it is hard to see how inclusion of such costs would increase the gas supply. Again, the Commission has not advanced any justification. The Commission cannot just shrug off the requirement of justification because another federal agency manages offshore leasing. It has an independent responsibility to consider national concerns which relate to its statutory duties.

The FPC must engage in the reasoned consideration necessary to formulate and justify its rate standards.[3] On remand, it will have the opportunity to engage in such consideration.

## I. THE OPTIONAL CERTIFICATION PROCEEDINGS

### A. Development of Optional Certification Standards

We begin with a brief review of the origin and changes in the optional certification program.

Under § 7(e) of the Natural Gas Act of 1938, 15 U.S.C. § 717f (1976), the FPC issues certificates of public convenience and necessity for new sales of natural gas. To do so, the FPC must approve the rates charged for those sales.[4] Since the task of particularized scrutiny of individual sales was too burdensome, in the 1960's the FPC adopted the practice, approved by the Supreme Court, of issuing § 7 certificates without such particularized scrutiny at rates close to the contemporary rates authorized under §§ 4 and 5 of the Act, 15 U.S.C. §§ 717c and 717d (1976).[5] Generally, the FPC would not subsequently require producers to refund rates certified in this way.[6] However, re-

---

**3.** Petitioner argues that the same problems involved here are involved in special relief proceedings. While the argument has some merit, we need not here express an opinion about the validity of standards for such proceedings.

**4.** *Atlantic Refining Co. v. Public Service Comm'n*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

**5.** *United Gas Improvement Co. v. Callery Properties, Inc.*, 382 U.S. 223, 88 S.Ct. 360, 15 L.Ed.2d 491 (1965). *See Consumer Federation of America v. FPC*, 169 U.S.App.D.C. 116, 125 n. 56, 515 F.2d 347, 356 n. 56, *cert. denied*, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975).

**6.** *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

funds were occasionally ordered, and producers were left in some uncertainty.[7]

To diminish this producer uncertainty, which had "impeded domestic exploration and development," the FPC issued Order No. 455 in 1972.[8] That order established an optional procedure for certification. Under the procedure, the FPC conducts an individualized proceeding which determines both whether a § 7 certificate should issue and also whether the proposed rate is reasonable under § 4. If all determinations are favorable, the proposed rate is a firm "refund floor," and no refunds can be ordered. Producers also receive other desirable benefits from such a certificate.[9]

Order No. 455 did not state what standard would be used in determining the reasonableness under § 4 of proposed rates, or what kind of factors would be considered. The FPC only promised that "certification shall conform to the standards of Sections 4 and 7 of the Natural Gas Act." [10] However, the Commission declared in a crucial holding that absent "special circumstances," a term of art which invoked very strict standards,[11] it would "accept as conclusive the cost findings embodied in our area rate decisions." [12] The Commission also declared in a negative way that proposed rates would be considered "notwithstanding that the [proposed] contract rate may be in excess of an area ceiling rate established in a

7. *Hunt Oil Co. v. FPC*, 424 F.2d 982, 985–86 (5th Cir. 1970).

8. *Optional Procedure for Certificating New Producer Sales of Natural Gas,* Docket No. R–441, Order No. 455, 48 F.P.C. 218, 223 (1972). The regulations established by the order are codified at 18 C.F.R. § 2.75 (1977).

9. The full details of the program are discussed in *Moss v. FPC*, 164 U.S.App.D.C. 1, 502 F.2d 461 (1974), *cert. denied in part*, 422 U.S. 1020, 95 S.Ct. 2642, 45 L.Ed.2d 680 (1975), *rev'd in part*, 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976). As the program's features were summarized, 424 U.S. at 497–98, 96 S.Ct. at 1006 (footnotes omitted):

> The optional procedure introduced by Order No. 455 was designed to "lessen rate uncertainty which has prevailed since the early 1960's." *Id.*, at 219. The procedure has several features. First, it permits producers to tender for FPC approval contracts for the sale of new natural gas at rates that may exceed the maximum authorized by the applicable rate order. Second, the FPC will determine in a single proceeding whether the "public convenience and necessity" under § 7(c) of the Act, 15 U.S.C. § 717f(c), warrants the issuance of a certificate authorizing the sale and whether the rates called for by the contract are "just and reasonable" under § 4(a), 15 U.S.C. § 717c(a). Third, a permanent certificate issued by the Commission and accepted by the producer is not subject to change in later proceedings under § 4 of the Act, 15 U.S.C. § 717c, and the rates may be collected without risk of refund obligations. 48 F.P.C., at 226. See 18 CFR § 2.75(d) (1975). Fourth, Order No. 455 authorizes inclusion in the permanent certificate of the abandonment assurance—or "pregranted abandonment"—called in question in this case. 18 CFR § 2.75(e) (1975).

10. Order 455–A, 48 FPC at 479, *quoted in Moss v. FPC, supra*, 164 U.S.App.D.C. at 7, 502 F.2d at 467. The requirement that certified rates meet the standards of both sections is embodied in 18 C.F.R. § 2.75(*l*) (1977).

11. The FPC's first completed area ratemaking proceeding and the Supreme Court's decision affirming it, *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), allowed producers "special relief" if the rates set threatened to be confiscatory. The Commission "emphasized, however, that a producer's inability to recover either its unsuccessful exploration costs or the full 12% return on its production would not, without more, warrant relief." 390 U.S. at 771, 88 S.Ct. at 1362. In applying this strict "special relief" standard to the § 7 certificate context (out of which optional certification developed), it was held that there would have to be a showing of "special circumstances" for a higher rate. *Phillips Petroleum Co. v. FPC*, 405 F.2d 6, 9 (10th Cir. 1969). *Phillips* was an important influence on Order No. 455, *see* 48 FPC at 222.

12. Order No. 455 states on this point, 48 FPC at 229:

> We believe that each contract filed under the alternative procedure must be considered on the merits of the terms and provisions within each contract. There certainly must be some evidentiary basis preferred by the seller-applicant upon which we can judge whether the contract rate is just and reasonable. We will, absent a showing of special circumstance, accept as conclusive the cost findings embodied in our area rate decisions, as such may be supplemented from time to time by appropriate Commission order.

The Commission later reemphasized this point. Order No. 455–A, 48 FPC at 481.

prior opinion or order of this Commission." [13]

In *Moss v. FPC, supra,* note 9, we upheld the optional certification procedures. We noted that since no standards for reasonableness had yet been prescribed, "we must assume that the Commission will abide by the standards of the statute and the promises it has made." [14] Shortly thereafter, we reviewed the FPC's approval of an optional certificate and its first standards. The FPC made clear that it intended to approve higher rates by optional certification than it had by an areawide ratemaking. It certified a rate of 45 cents per Mcf, at a time when the corresponding area rate was 26 cents per Mcf, relying on a "supply project" approach with vague standards as to what was reasonable and in consideration of both non-cost factors and national "test year" cost data. [15]

In reviewing that certification, we noted that the fundamental notion of a "supply project" approach "requiring the Commission to rely on individualized cost data . . would have to be reconciled with this court's opinion in *Moss,* which approved, by implication, the Commission's avowed intent to rely on ' "cost findings embodied in our area rate decisions." ' " *Consumers Union of U.S., Inc. v. FPC,* 166 U.S.App.D.C. 276, 278, 510 F.2d 656, 658 (1974). It was unnecessary in *Consumers Union* to determine whether the Commission had reconciled its new supply project approach with its prior statements because we reversed the certification for failure to consider actual cost data.

After oral argument in *Consumers Union* but before our opinion was issued, the FPC changed to a new set of standards for optional certification. It declared that individual actual cost data would henceforth be "relevant" in optional procedures. [16] It was apparently intended that the standard for reasonableness henceforth would be whether the proposed rate provided full reimbursement plus a full return on projects' total actual costs. [17] At that time, and in subsequent opinions, the Commission gave almost no justification for its new total-project-cost standard, which was a complete change from the premise of Order No. 455 as originally issued, and a radical departure from the policy of setting reasonable rates based on *average* costs of many projects. There was thus no reasoned consideration given to the novel problems of incentive effect and coordination created by a total cost standard for individual projects.

### B. *Factual Background and Proceedings*

In 1960, Union Producing Company (Pennzoil) [18] made a successful bid in the Department of the Interior's offshore leas-

---

13. 18 C.F.R. § 2.75(e) (1977), *first stated in Notice of Proposed Rule Making,* 37 Fed.Reg. 7345, 7346 (1972), *quoted in Moss v. FPC, supra,* 164 U.S.App.D.C. at 3, 502 F.2d at 463.

14. *Moss v. FPC, supra,* 164 U.S.App.D.C. at 7, 502 F.2d at 467. In general, Order No. 455 established the procedures for optional certification, leaving all substantive standards to the future. *See FPC v. Moss,* 424 U.S. 494, 501–02, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976). We may note we declared that "as a practical matter one may be skeptical about the ability of the Commission to succeed in this endeavor," *Moss v. FPC, supra,* 164 U.S.App.D.C. at 8, 502 F.2d at 468 (Robb, J.). In retrospect, that skepticism may have been warranted.

15. *Belco Petroleum Corp.,* 49 FPC 1154 (1973), *reversed sub nom. Consumers Union of U.S., Inc. v. FPC,* 166 U.S.App.D.C. 276, 510 F.2d 656 (1974), *see* Opinion No. 699, 51 FPC 2212, 2287 (1974).

16. *W. C. Perryman & J. A. Wallender,* 51 FPC 1545 (1974) (mentioning that identical orders in other cases were unreported); *The Rodman Corp.,* 51 FPC 1548 (1974); *see Stingray Pipeline Co.,* 51 FPC 1446 (1974); *McCulloch Oil Corp.,* 52 FPC 1430 (1974).

17. *W. C. Perryman & J. A. Wallender,* 51 FPC 1545, 1547 (1974) (Commissioner Smith, concurring). The majority opinion declared that actual cost data would constitute the "special circumstances" referred to in Order No. 455. The significance of this abbreviated comment was spelled out by Commissioner Smith in his concurrence.

18. During the period since lease acquisition, Union Producing Company has become Pennzoil Producing Company. It spun off the United Gas Pipe Line Company (United), the purchaser of the gas here.

ing program and acquired an interest in a lease for Ship Shoal Block 186, a 5000 acre area 100 miles off the Louisiana coast. Initial drilling and a tentative sale in the 1960's were unsuccessful. In 1972, when it seemed likely that the FPC would soon approve a rate of 26 cents per Mcf in its areawide ratemaking, the decision was made to drill a new well. That well was successful. In August, 1973, Pennzoil entered into a contract, with United Gas Pipe Line Co. (United), to supply gas from the project at 47 cents per Mcf.[19] In October, 1973, Pennzoil and United submitted the contract as an application for an optional certificate. As provided under the then current regulations, 18 C.F.R. § 2.75(o) (1974), Pennzoil received the area rate for the first six months of delivery, and then received the contract rate of 47 cents per Mcf.

After hearings, the administrative law judge issued an initial decision in April, 1974, denying the Pennzoil-United application. On appeal, the Commission remanded in July, 1974, for a hearing on the actual project costs.[20] In August, 1974, Pennzoil and United sought to substitute for their initial 47 cent rate an "amended" contract at a rate of 80 cents per Mcf. The FPC refused to allow the "amended" contract

rate to go into effect pending consideration, although it eventually allowed the certificate to issue at that rate.[21]

On remand to the administrative law judge, Pennzoil submitted proof of its total actual project costs. Those costs, counting lease acquisition and other sunk costs of the 1960's and taking into account the one-sixth royalty owed to the United States as lessor, were 65 cents per Mcf.[22] Allowing a fifteen per cent return for the years since production began resulted in a total cost-based potential rate of $1.015 per Mcf, seemingly more than justifying the Pennzoil proposed rate of 80 cents per Mcf.[23]

The FPC issued Pennzoil a certificate in February, 1976.[24] The FPC accepted the 80 cent rate amendment and approved that figure as justified by the actual total project costs. Public Service Commission of New York (New York), an intervenor, sought rehearing. The FPC reaffirmed its order in March, 1976 and New York appealed.

## II. PRINCIPLES OF REVIEW

### A. Scope of Review

The scope of review of FPC rate orders is a familiar one requiring little elaboration here.[25] Section 19(b) of the Natural Gas

---

19. This rate was similar to what the FPC was allowing under its "test year" approach, subsequently rejected by this Court. See *Consumers Union of U.S., Inc. v. FPC*, 166 U.S.App.D.C. 276, 510 F.2d 656 (1974).

20. This was in line with new FPC policy. See note 16, *supra*.

21. Since then, the FPC amended 18 C.F.R. § 2.75(o) to make clear that it only allows the "contract initially filed" to go into effect during optional proceedings. 18 C.F.R. § 2.75(o) (1977); *see Pennzoil Offshore Gas Operations, Inc. v. FPC*, 560 F.2d 1217 (5th Cir. 1977).

22. Costs included lease acquisition, dry hole and exploratory, successful well costs, production facilities, and production operating expense, for a total of 53.8 cents per Mcf. Adjusting for the one-sixth royalty, costs were 65 cents per Mcf. For a further breakdown of costs, see note 44, *infra*. Pennzoil had only a partial interest in this lease; all figures in this opinion are adjusted to relate only to that partial interest.

23. Pennzoil further contended that it was entitled to a return for the years before the lease began producing gas. Including those extra years, the potential rate of cost plus return became $1.65 per Mcf. Since even the "low" figure of $1.015 more than covered the amended contract price of 80 cents per Mcf, the administrative law judge and the Commission found it unnecessary to reach the argument for a return on the years before production.

24. Opinion 752, Pennzoil Producing Company, Docket No. CI74–244 12 F.P.S. 5–385 (Feb. 2, 1976), *rehearing denied*, Opinion 752–A, 12 F.P.S. 5–816 (March 22, 1976).

25. For fuller treatments of the scope of review, see e. g., *Public Service Comm'n v. FPC*, 167 U.S.App.D.C. 100, 106–08, 511 F.2d 338, 344–46 (1975); *MacDonald v. FPC*, 164 U.S.App. D.C. 248, 255–56, 505 F.2d 355, 362–63 (1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975); *Public Service Comm'n v. FPC*, 177 U.S.App.D.C. 389, 394, 405–06, 543 F.2d 874, 879, 890–91 (1974) (Robinson, J., dissenting).

Act, 15 U.S.C. § 717r(b) (1976), provides that in review of FPC orders by the courts of appeals, "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." In the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), the Supreme Court delineated three responsibilities of the reviewing court: to determine whether the Commission's order abused or exceeded its authority, whether each element of the order was supported by substantial evidence, and whether the order would maintain financial integrity while providing protection for the relevant public interests. These responsibilities were summed up in a key sentence: "[t]he court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given *reasoned consideration* to each of the pertinent factors." 390 U.S. at 792, 88 S.Ct. at 1373 (emphasis added.)

### B. *Statutory Standard*

■ There is also no issue about the relevant statutory standard. For certification under the optional procedure, a proposed rate must meet both the "public convenience" standard of § 7 of the Natural Gas Act, and the "just and reasonable" rate standard of § 4.[26] Of the two, § 4's require-

ment is the more stringent one and thus the controlling one for rate approval.[27]

### C. *Principles of Review of Ancillary FPC Producer Regulation*

Optional certification, like other new FPC initiatives of the last decade, poses certain special problems for judicial review which we deem worthy of separate discussion.

The main path of development in FPC producer regulation has been, of course, the evolution from individualized ratemaking to areawide and nationwide ratemaking. However, in the last decade, there has been a second major path of development in FPC producer regulation in the form of a series of special ratemaking programs.[28] These have included deregulation of small producers,[29] deregulation of emergency purchases,[30] advance payments,[31] special relief proceedings,[32] contingent escalations and refund work-off credits,[33] and special rates for renewal contracts ("rollover gas").[34]

■ Some of these programs have patently violated the statutory command that the FPC exercise its responsibility to regulate producer rates and that it not simply rubber stamp rates set by contract.[35] Other programs have presented the courts with a more difficult task calling for sensitivity to the conflict between the need for administrative flexibility in responding to a crisis

**26.** Order No. 455–A, 48 FPC at 479; *Moss v. FPC, supra,* 164 U.S.App.D.C. at 7, 502 F.2d at 467; 18 C.F.R. § 2.75(*1*) (1977).

**27.** *Cities of Fulton v. FPC,* 168 U.S.App.D.C. 33, 35, 512 F.2d 947, 949 (1975).

**28.** These new initiatives, and the resulting judicial review, has aroused considerable interest among commentators as something of a classic case of administrative-judicial interaction. *See* Fiorino, Judicial-Administrative Interaction in Regulatory Policy Making: The Case of the Federal Power Commission, 28 Admin.L.Rev. 41 (1976); Daniel, Independent Natural Gas Producers, the FPC and the Courts: A Case of Judicial Intermeddling, 53 Tex.L.Rev. 784 (1975).

**29.** *FPC v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

**30.** *Consumer Federation of America v. FPC,* 169 U.S.App.D.C. 116, 515 F.2d 347, *cert. de-*

nied, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975).

**31.** *Public Service Comm'n v. FPC,* 151 U.S. App.D.C. 307, 467 F.2d 361 (1972); 167 U.S. App.D.C. 100, 511 F.2d 338 (1975).

**32.** *MacDonald v. FPC,* 164 U.S.App.D.C. 248, 505 F.2d 355 (1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975).

**33.** *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 316–17, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

**34.** *The Second National Natural Gas Rate Cases,* 186 U.S.App.D.C. 23, 567 F.2d 1016 (1977), *cert. denied,* 435 U.S. 967, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

**35.** See, *e. g., FPC v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

situation and the overriding requirement of administrative fidelity to legislative command. We have been consistently "mindful of the broad discretion accorded the Federal Power Commission in its efforts ' "to devise methods of regulation capable of equitably reconciling diverse and conflicting interests" . . . in this time of acute energy shortage.' " [36] However, we have also been mindful that Congress created the FPC to impose limits that avoid extortionate natural gas rates. If a decision is to be made to deregulate natural gas prices, it must be made by Congress, not by the FPC, and this court cannot permit administrative transgression of the legislative mandate in this regard. Accordingly, we have been consistently concerned "that the FPC [give] 'reasoned consideration' to the shaping of its order in an effort to protect consumers from paying substantially more than necessary to bring forth the needed supplies." [37]

▮ To resolve the conflict, we have elaborated several flexible principles of review applicable to these cases, which we discuss below but summarize here to provide an overall perspective. The basic tension in reviewing these FPC programs is that they provide producers with rates in excess of those found to be "just and reasonable" under the nationwide ratemaking proceedings. In return, these ancillary programs, according to the FPC, encourage producers to engage in additional exploration and development of vitally needed new gas sources. We have upheld these programs if they satisfy three principles. There must be substantial evidence showing a *demonstrable connection* between the funding in the program under scrutiny and the increased gas supply which it will allegedly produce.[38] There must be some

minimum level of coordination of the program under scrutiny with national ratemaking and other programs so that they create no conflicting or unnecessarily duplicating incentives.[39] Lastly, there must be evidence of producers' actual costs so that it can be determined whether the additional funding results in profits too huge to be reconcilable with the legislative command.[40]

## III. CHALLENGES TO THE FPC'S ALLOWANCE OF TOTAL PROJECT COSTS AS AN INCENTIVE

### A. *General Arguments*

New York challenges the Commission's allowance of a rate of 80 cents per Mcf in this proceeding on the general ground that the rate was entirely unnecessary to secure new gas for the interstate market. New York raises several specific points. It notes that Pennzoil was willing to make the final requisite investments to produce this gas in the early 1970's when the areawide rate was only 26 cents per Mcf. It also notes that the gas at issue here came from an offshore federal lease, involving two special considerations: that full compensation to producers for lease acquisition costs needlessly spurs the upward spiral in lease bidding; and that the FPC's jurisdiction over offshore gas—as contrasted with the lack of jurisdiction over onshore gas sold in intrastate commerce—lessens the need for extra financial incentives to secure that gas for the interstate market. Finally, New York contends that there are fundamental inconsistencies between the average cost method of national ratemaking, under which high-cost production serves to enhance the average costs and the national price available to low-cost producers, and the standards of the optional certificate program, which compen-

**36.** *Public Service Comm'n v. FPC*, 167 U.S. App.D.C. 100, 116, 511 F.2d 338, 354 (1975) [advance payments remand], *quoting Mobil Oil Corp. v. FPC*, 417 U.S. 283, 332, 94 S.Ct. 3167, 41 L.Ed.2d 1136 (1974), *quoting Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

**37.** *Cities of Fulton v. FPC*, 168 U.S.App.D.C. 33, 37, 512 F.2d 947, 951 (1975).

**38.** See p. —— of 191 U.S.App.D.C., p. 553 of 589 F.2d *infra*.

**39.** See pp. ——–—— of 191 U.S.App.D.C., pp. 559–560 of 589 F.2d *infra*.

**40.** *See Consumers Union of U.S. Inc. v. FPC*, 166 U.S.App.D.C. 276, 510 F.2d 656 (1974). Actual cost data was put in evidence and analyzed in this case.

sates producers of high-cost gas on the basis of their own high costs alone.

█ The FPC and Pennzoil, intervenor on appeal, make two general responses to New York's contentions.[41] First, they argue that New York is challenging the core "concept" of the optional certification procedure, and this challenge, it is argued, was rejected in *Moss v. FPC.* However, this court has not previously upheld a total project cost standard under the optional certification program. As discussed above, *Moss v. FPC* upheld the novel procedural aspects of optional certification, notably the combination of Section 7 and 4 proceedings. We specifically noted that we were not presented at that time with FPC standards for reasonableness and that we were assuming that the standards eventually adopted would conform to the statute. "On the present record," we said, "we must *assume* that the Commission will abide by the standards of the statute and the promises it has made. We cannot condemn the Commission on the theory that it may not do what it has promised to do." *Moss v. FPC, supra,* 164 U.S.App.D.C. at 7, 502 F.2d at 467 (emphasis supplied). We cannot sensibly uphold the Commission's standards now on the ground that this ruling was established in *Moss v. FPC,* when the fact is that we upheld the FPC in *Moss* as to procedure, on the *assumption* that the standards issued in due course would be consistent with the statute. To provide judicial affirmance without judicial review through circularity or bootstrapping is not consonant with the review function entrusted to the courts.

The Commission has now taken the step that it had not at the time of *Moss,* of setting forth the substantive principle—the total project cost standard—for optional certification. Now we must determine whether that principle is reasonable and consistent with the statute and the purpose of the optional certification program.

Our view of *Moss* is confirmed by our holding in *Consumers Union,* the same year as *Moss,* that the FPC's first set of optional certification standards violated the statute. We specifically noted in *Consumers Union* that standards based on individual project costs would have to be reconciled with prior FPC statements and ratemaking approaches.[42] It is precisely that reconciliation which the FPC has failed to perform.

█ The other FPC response, that if rates under the optional program were limited to the national rate "there would be no point to the optional procedure", also fails to meet New York's arguments. This is not a situation of only two alternatives, of either making the national rate an inflexible ceiling on optional rates, or accepting unconditionally the FPC's total project costs approach. Rather, the issue is whether all the elements of the total project costs approach have been justified by reasoned consideration, in light of the principles of review for FPC programs. Change in administrative standards in light of the increased experience under them is appropriate, and may be desirable if flaws are discerned in the previous standards. However, change must be accompanied by reasoned consider-

41. Pennzoil sprinkles its brief with allegations that a rate below 80 cents per Mcf would be "confiscatory" because the company would not recover its costs on this project plus a return.

In its generalized area ratemaking the Commission, while not free of constitutional restraints, is not bound to the same requirement for each individual producer as in the case of regulation of a single monopoly or quasi-monopoly utility. *Permian Basin Area Rate Cases,* 390 U.S. 747, 769–70, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

Pennzoil does not submit the comparison of "the *total* rate of return to the value of dedicated property *as a whole.*" *Transcontinental Gas Pipe Line Corp. v. FPC,* 171 U.S.App.D.C. 66,

72, 518 F.2d 459, 465 (1975) (emphasis added). Nor does Pennzoil make allegations like those of the "unusual circumstances" which supported a finding of confiscation in *Algonquin LNG, Inc. v. FERC,* 187 U.S.App.D.C. 134, 570 F.2d 1043 (1978) (Commission delayed authorizing an LNG facility, causing a ruinous drop from projected sales of 391,000 barrels of LNG to actual sales of 280,400; nonetheless, the Commission insisted on applying the rate formula used by the company in its original application, which now bore no relation to reality).

42. *Consumers Union of U.S., Inc. v. FPC,* 166 U.S.App.D.C. 276, 278, 510 F.2d 656, 658 (1974).

ation supporting the new standards. "[T]he process of change in agency policy must be one that serves and does not erode the principle of reasoned decision making." *Public Service Comm'n v. FPC, supra,* 167 U.S.App.D.C. at 115, 511 F.2d at 353. As we have stated, *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971):

> Judicial vigilance to enforce the Rule of Law in the administrative process is particularly called upon where, as here, the area under consideration is one wherein the Commission's policies are in flux. An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

### B. *Treatment of pre-1972 Sunk Costs*

In its argument, New York [43]

does not dispute that higher producer rates based on project cost considerations may be justified if it can be shown, generally or in individual situations, that they are required in order to provide needed additional gas supplies to the interstate market at prices compatible with consumer interests. But there can be no basis for guaranteeing producers more than their production costs in the absence of such a showing.

Specifically, New York argues that even if the total project cost (without allowing for any return on investment) were 65 cents per Mcf, the gas here would have been forthcoming at a lower price than that. Allowance of a rate based on total project cost thus constituted a windfall to the producer without any demonstrable connection to increasing the supply of gas.

The support for the validity of New York's contention lies in the economic logic of "sunk costs." In 1960–61, without, of course, any expectation of optional certification treatment, Pennzoil sank large sums into lease acquisition and drilling. It had no success during that period. In 1972–73, when Pennzoil had to make a decision as to whether to renew its efforts, those older costs were irretrievably "sunk" and could no longer be reallocated or left unspent in light of new inducements to invest elsewhere. The only relevant considerations for Pennzoil in 1972–73 were whether the new inducements warranted new expenditures. Roughly speaking, of the 65 cents per Mcf eventually expended by Pennzoil, 33 cents had been "sunk" in the 1960's, while only 32 cents were newly expended in the 1970's.[44] The areawide rate of 26 cents per Mcf in 1972, with a likely prospect of significant increase in the near future, was adequate to induce the further investment, without any guarantee it would cover both that further investment and the previously sunk outlays.

Where, as here, an agency has established national rates on an average cost basis, and individual exceptions escalating the price above the national rate are estab-

---

43. Petitioner's Brief at 32.

44. Pennzoil provided schedules of project costs. R. 813–15. Sunk costs of the 1960's included lease acquisition, 18.5 cents per Mcf; dry hole and exploratory, 4.8 cents; and more than half of successful well costs, 4.4 cents, for a total of 27.7 cents. New outlays of the 1970's included less than half of successful well costs, 4 cents; production facilities, 13.4 cents; and production operating expense, 8.8 cents, for a total of 26.2 cents. These totals must be adjusted for the United States' one-sixth royalty,

to 33.2 and 31.4 cents respectively, totalling (after rounding out) 65 cents per Mcf project costs.

The principle discussed in text, not the illustrative discussion of specific figures, is decisive here. We note, for example, that the FPC staff contested the adjustment of Pennzoil's costs to include the royalty paid to the United States, *before* calculation of the percentage return. R. 1173. Such alternative accounting approaches would alter the specific figures but would not undermine the principle involved here.

lished in the interest of increasing supply, there must be a connection between such increased funding and the increased exploration and development of new gas sources alleged to result. This principle has been stated in a number of ways: that there must be a *"quid pro quo"* for the extra funding;[45] that there must be an "inquiry into the incremental increase in gas supply" attributable to the program;[46] and that there must be "symmetry" between the funding and increase in production.[47] In the Supreme Court's words, the program must provide increased funding "while assuring that such increase would not be levied upon consumers unless accompanied by increased supplies of gas." *Mobil Oil Corp.*

*v. FPC*, 417 U.S. 283, 318, 94 S.Ct. 2328, 2350, 41 L.Ed.2d 72 (1974). On occasion, an experimental program may be allowed to commence a tentative existence without such a showing of a connection if the FPC is committed in its continuation of the program to monitoring in order to verify that such a connection exists.[48] Such programs are subject to being vacated if the Commission fails to make the requisite demonstration.[49]

In its programs to provide incentive for new expenditures the FPC has long been concerned with avoiding payment for expenditures "sunk" before the announcement of the incentive, *i. e.*, with avoiding a

---

**45.** *MacDonald v. FPC*, 164 U.S.App.D.C. 248, 258, 505 F.2d 355, 365 (1974). *See The Second National Natural Gas Rate Cases, supra*, 186 U.S.App.D.C. at 66–67, 567 F.2d at 1059–60, *quoting Shell Oil Co. v. FPC*, 520 F.2d 1061, 1077 (1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). In the absence of a clear *quid pro quo* in *The Second National Natural Gas Rate Cases* for the generous pricing of rollover gas, that increased funding program was only allowed on an experimental basis.

**46.** *Public Service Comm'n v. FPC*, 167 U.S. App.D.C. 100, 109, 511 F.2d 338, 347 (1974).

**47.** *Cities of Fulton v. FPC*, 188 U.S.App.D.C. 33, 38, 512 F.2d 947, 952 (1975).

**48.** *Public Service Comm'n v. FPC*, 151 U.S. App.D.C. 307, 467 F.2d 316 (1972); *The Second National Natural. Gas Rate Cases, supra*, 186 U.S.App.D.C. at 50, 567 F.2d at 1043 (income tax model); *id.* at 53–54, 567 F.2d at 1046–47 (gathering of gas reserve data); *id.* at 66, 567 F.2d at 1059 (rollover gas pricing); *cf. Shell Oil Co. v. FPC*, 520 F.2d 1061, 1077 (5th Cir. 1975) ("tentative balance"), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976).

**49.** *See generally Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968) (deference to the FPC "must significantly lessen as the Commission's experience . . . lengthens"). The advance payments program provides the fullest example of the evolution of an experimental FPC program. The FPC established the program with Order No. 410, 44 FPC 1142 (1970), and Order No. 441, 46 FPC 1178 (1971). These were affirmed on a tentative, experimental basis, awaiting a showing by the FPC of a demon-

strable connection between the increased funding and new gas supplies. *Public Service Comm'n v. FPC*, 151 U.S.App.D.C. 307, 407 F.2d 361 (1972). The FPC continued the program with Order No. 465, 48 FPC 1550 (1972) and Order No. 499, 50 FPC 2111 (1973). These orders evinced an awareness of the difficulty in showing any demonstrable connection, except for funds advanced within a short ("reasonable") time of expenditure for exploration and development, by clarifying "reasonable time" limits. *See* 50 FPC at 2115; 51 FPC at 819 (explaining the significance of "reasonable" time); *Natural Gas Pipeline Co.*, 52 FPC 652, 655 (1974). This court reviewed the 1972 and 1973 orders and concluded the FPC had failed to show a demonstrable connection, *Public Service Comm'n v. FPC*, 167 U.S.App.D.C. 100, 511 F.2d 338 (1975), but commended the FPC for its "reasonable time" limitation, 167 U.S. App.D.C. at 117 n.115, 511 F.2d at 355 n.115. In our order on remand, we required the Commission, in the course of its on-going evaluation of the effectiveness of the advance payments program, to give "prompt and careful attention" to the problems identified in our opinion, particularly the absence of data or estimates as to the incremental incentive effect of the advance payments program on gas reserves. Subsequently, the Commission abandoned the program prospectively, Order on Remand, 41 Fed.Reg. 2776 (1976), and fully elaborated its "reasonable time" limitation, Opinion 769, *Tennessee Gas Pipeline Co. v. FPC*, (July 9, 1976), *appeal pending*, No. 77–1496 (D.C. Cir. filed June 2, 1977). The FPC's ultimate standards require an explicit showing of a demonstrable connection between advance payments and increased supplies of gas by a "positive benefit" test.

windfall for old expenditures. In its policy of vintaging, particularly with regard to gas in renewal contracts ("rollover gas"), recently upheld by this court, the Commission has declined to allow new, high rates to be paid to producers who invested before the prospect of such rates.[50] "It is difficult to see how [a] higher rate could reasonable have been expected to encourage retrospectively, exploration and production that had already occurred". *Permian Basin Area Rate Cases*, 390 U.S. 747, 798, 88 S.Ct. 1344, 1376, 20 L.Ed.2d 312 (1968). Here, in its novel extension of total project costs as a basis for rates to include sunk costs of a period before the onset of the program, the Commission has failed to give " 'reasoned consideration' to the shaping of its order in an effort to protect consumers from paying substantially more than necessary to bring forth the needed supplies." [51]

### C. *Treatment of Offshore Lease Acquisition Costs*

The FPC's approval of Pennzoil's proposed rate was based on the total of all Pennzoil's project costs, including the lease acquisition cost (the original cost of acquiring the offshore lease from the federal government). In other words, the FPC's standard guaranteed reimbursement for lease acquisition costs in the same way it guaranteed reimbursement for exploration and development costs. Such an approach has serious prospective consequences. New York argued before the Commission on rehearing that "if such a guarantee is al-lowed to cover total project costs including lease acquisition costs its primary effect in the offshore area could well be to permit those producers with ready access to capital to bid up offshore leases above their present overly high level." [52] On appeal, New York renewed its argument, contending that "the main effect of such a system (and a main vice of the Commission's present opinion) could well be to remove the last restraints on the already spiralling [offshore lease] bonus payments, with no real increase in gas exploration and production." [53] The Commission has failed to give adequate consideration to the increasingly significant problem of offshore lease acquisition costs in rate proceedings. In the optional certification context, the FPC has given no consideration at all to the problem, despite the conflict between the program's objective of increasing exploration and development and the effect of an incentive for lease acquisition expenditure.

### i. *Lease Acquisition*

We begin by noting the dimensions of the lease acquisition issue. According to statistics compiled by the Department of the Interior and used by the FPC, the costs of lease acquisition for offshore oil and gas have grown enormously in the past decade. Those costs rose from less than $3 billion in the five years from 1967–71, to $2 billion in 1972, $3 billion in 1973, and $5 billion in 1974, for a total of over $13 billion in 1967–

**50.** *The Second National Natural Gas Rate Cases, supra,* 186 U.S.App.D.C. at 40–41, 567 F.2d at 1033–34; *Koch Industries, Inc. v. FPC,* 180 U.S.App.D.C. 299, 554 F.2d 1158 (1977). *Compare Shell Oil Co. v. FPC,* 491 F.2d 82 (5th Cir. 1974); *Public Service Comm'n v. FPC,* 177 U.S.App.D.C. 389, 543 F.2d 874 (1976) (temporary phasing out of vintaging, which was subsequently reviewed).

**51.** *Cities of Fulton v. FPC,* 168 U.S.App.D.C. 33, 39, 512 F.2d 947, 951 (1975), *quoting Mobil Oil Corp. v. FPC,* 417 U.S. 283, 332, 94 S.Ct. 3167, 41 L.Ed.2d 1136 (1974), *quoting Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

**52.** Petitioner's Application on Rehearing at 2, R. 1225. Since lease costs are a form of rent, New York was invoking the current FPC approach toward the function of price ceilings. "[L]imiting producer rents and windfalls is the more important concern underlying recent regulation." Breyer & MacAvoy, The Natural Gas Shortage and the Regulation of Natural Gas Producers, 86 Harv.L.Rev. 941, 952 (1973).

**53.** Petitioner's Brief at 35.

74.[54] Leasing at high bidding levels has continued since 1974.[55] Much of this cost will eventually be reflected in oil rather than gas prices, but lease acquisition costs constitute a large and increasing share of rising natural gas prices. Moreover, the long lead time between leasing and production ensures that present lease acquisition incentives will affect rates for decades to come.

The courts have repeatedly admonished the FPC in various contexts that the much larger lease acquisition costs offshore, and other related differences between offshore and onshore gas, must be the subject of reasoned consideration in ratemaking. In *The Second National Natural Gas Rate Cases, supra,* 186 U.S.App.D.C. at 56, 567 F.2d at 1049, we stated:

> The objection that has given us distinct pause is the contention that "there is no validity to the Commission's continued insistence upon treating as a single gas source onshore gas subject to unregulated intrastate competition, and offshore gas from the Federal domain over which the Commission exercises plenary authority and to which the interstate market must look for most of its new gas supplies."

We affirmed the FPC's national ratemaking order only with the limitation that the FPC would have to "give more attentive consideration" to the special situation of offshore costs, *id.* at 57–58, 567 F.2d at 1050–1051; *see also id.* at 67, 567 F.2d at 1060.

Similarly, in *Public Service Comm'n v. FPC, supra,* 167 U.S.App.D.C. at 114, 511 F.2d at 352 (footnotes omitted), in remand-ing for further consideration of advance payments, we addressed the FPC's failure to take into account in advance payment orders the great difference between onshore and offshore in regulatory power and practical circumstances:

> The Commission's treatment of advances related to offshore gas blandly sidesteps all and any mention of the critical fact of its plenary power to prevent diversion of gas from wells on leases in the federal domain to the interstate market. Whatever role advance payments may play in attracting onshore gas from the intrastate and to the interstate market, this justification is absent in the case of advances to offshore producers. Any reasoned assessment of the relation of costs and benefits of the advance payments program involves manifestly different calculations for offshore and onshore advances. The complete failure on the part of the FPC to focus on this issue is a failure to seek answers.

Moreover, the Commission declined to respond to submissions by New York which cast doubt on the need for advances to spur acceleration of the exploration and development of offshore reserves.

Moreover, in our most recent optional certification case, *Consumers Union of U.S., Inc. v. FPC, supra,* 166 U.S.App.D.C. at 281–82, 510 F.2d at 661–62, we took special note on rehearing of producers' contentions about the higher offshore lease acquisition costs. In upholding the 1974–75 national ratemaking proceeding, the Fifth Circuit, too, noted the boom in lease acquisition

---

**54.** Opinion 770–A, 41 Fed.Reg. 50199, 50224 (1976) (Exhibit 15 in part).

EXHIBIT 15.—*Lease acquisition costs: Offshore and onshore*

[In millions of dollars]

| Year | Lease acquisition costs | | |
|------|------|------|------|
| | Off-shore | On-shore | Overall |
| 1967 | 510 | 319 | 829 |
| 1968 | 1,346 | 232 | 1,578 |
| 1969 | 112 | 1,025 | 1,137 |
| 1970 | 945 | (231) | 714 |
| 1971 | 96 | 546 | 642 |

| Year | Lease acquisition costs | | |
|------|------|------|------|
| | Off-shore | On-shore | Overall |
| 1972 | 2,251 | (529) | 1,722 |
| 1973 | 3,082 | 564 | 3,646 |
| 1974 | 5,023 | 636 | 5,659 |
| Total, 1967–74 | 13,365 | 2,562 | 15,927 |

**55.** Bidding at high levels has continued. *See, e. g., State of Alaska v. Andrus,* 188 U.S.App.D.C. 202, 580 F.2d 465 (1978); *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2d Cir. 1977); Cole, The Proposed Outer Continental Shelf Lands Act Amendments of 1976; An In-

costs and explicitly warned that "the Commission is *surely obligated to monitor* these developments . . . ." *Shell Oil Co. v. FPC, supra,* 520 F.2d at 1082 (emphasis supplied). The FPC's sole response to the trend in offshore leasing costs has been to average older, lower lease costs with recent costs in computing national ratemaking averages, thereby temporarily deferring the impact on rates of high recent costs.[56] The record in this areas is thus one of repeated FPC failures to study and consider in active policy formulation the major developments in offshore gas and lease acquisition costs, even though they threaten large future increases in nonproductive expenses, returns on investments, and gas prices.

### ii. *Optional certification objectives in its formulation of the national rate*

We may assume for present purposes that the FPC can include all reasonable lease acquisition costs in national ratemaking.[57] However, the optional certification program has been developed as an exception to the national rate, to escalate rates in order to provide an incentive necessary for exploration and development. Absent justification by the FPC, a standard guaranteeing reimbursement for all lease acquisition costs incurred cannot be upheld under that objective.

The optional program provides reimbursement for expenditures because of the connection between an incentive for higher expenditure and supplies of new gas. There is an obvious connection between an incentive spurring expenditures for exploration and development, and gas supply— since for practical purposes in the short term, the opportunities to employ such expenditures to augment supply are unlimited. There is no such obvious value for the consuming public in escalating expenditures for lease acquisition.[58] The acreage which is made available by the federal government for lease bidding is limited. The Commission has not explained on what basis a spur for higher acquisition expenditures goes beyond raising the bids made for acreage that would be leased anyway, or has a substantial effect in increasing acreage.

Any reimbursement for lease acquisition costs through the optional certification program must address the problem of delay between expenditures and reimbursement. In this case, Pennzoil's lease expenditures were made thirteen years before project completion and reimbursement, and in general, lease outlays are made long before reimbursement. At the time when producers bid on leases, optional certification is no more than a distant possibility. Reimbursement for lease costs operates as a bailout at the end of a losing project, but the question is whether it is a significant incentive at the time of bidding on leases. Reimbursement for lease costs contrasts in this respect with reimbursement for development outlays. Development outlays are made later in the production cycle, so optional certification is a closer, more calculable and influential prospect.

adequate Guide to Outer Continental Shelf Development, 14 Harv.J.Legis. 358, 368 (1977).

**56.** The FPC factors lease acquisition costs into its national ratemaking by averaging those costs over several years, generally the most recent years for which full data is available. *See Shell Oil Co. v. FPC,* 520 F.2d 1061, 1082 (5th Cir. 1975) (average of 1967–72), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976); Opinion 770–A, 39 Fed.Reg. 50199, 50208 (1976) (weighted average over eight years). Thus, the impact of current lease acquisition expenditures has not yet been fully felt. It will hit in the next few years, building an automatic escalator into natural gas prices.

**57.** In distinguishing optional certification from national ratemaking, we do not imply any view as to whether the FPC's present approach to lease costs in national ratemaking is correct. That question is not before us. We have already quoted judgments as to the FPC's need to monitor lease costs which were made by courts reviewing national ratemaking.

**58.** Spurring lease bidding does produce more revenue for the federal government. The appropriate manner to consider national leasing policy in setting optional certification standards is discussed below. In any event, most of the reimbursement provided to producers for lease acquisition costs would not be a repayment of the revenue paid to the government through lease bids, but a surcharge covering the fifteen per cent return per year to the producers.

At bottom, the issue is whether companies that make a lease bid largely on calculation of the relative likelihood of high production or dry holes can obtain an exception—over and above average lease acquisition costs—to transfer high costs to consumers in the intermediate case that the project produces medium-sized volumes of high-cost gas. It would be anomalous if producers received handsome returns because of high volume in highly productive fields, and also high optional rates in less productive fields. An incentive must also be related to its objectives.

The Commission did not give any consideration whatever, much less reasoned consideration, to the problem of undesirable effects from reimbursement for lease acquisition costs. Producers have limited budgets for spending on all aspects of the production cycle from leasing to operating. Incentives for one kind of spending induce a shift away from other kinds of spending. An incentive which makes it more desirable to put in high lease bids may thus divert funding from exploration and development. Such an "incentive" may actually be counter-productive for the program's purposes. Also, the present lease acquisition system may have built-in anticompetitive aspects in terms of benefiting the larger, cash-rich producers which are best able to make high cash bonus bids. A program which gives a large share of incentive funding as reimbursement for lease bids may perpetuate and strengthen those anticompetitive aspects.[59] It is well settled that the Commission must take into account the effects of

its programs on competition as well as on production.[60]

iii. *FPC Authority*

The FPC has sometimes attempted to justify a failure to give consideration to problems of lease acquisition costs by asserting a lack of information or authority to deal with them. As the Commission declared in its most recent national ratemaking proceeding, Opinion 770–A, 41 Fed.Reg. 50199, 50208–09 (1976):

At the same time, we determined that lease acquisition costs are legitimate actual costs which must be recouped by producers as part of their cost-of service. *Mobil Oil Corp. v. F.P.C., supra.* The suggestion of APGA to disallow pass-through of certain costs, therefore, would be unlawful.

NYPSC does not object to our current treatment of lease acquisition costs, but suggests:

The Commission should expressly announce in its Opinion on Rehearing that its future nationwide rate determination will not utilize any ratio which exceeds the 1.1 figure utilized in Opinion No. 770, with any higher figure which might be applicable in specific cases as a result of lease sale bonus payments in 1975 or 1976 being the subject of special relief applications.

While we appreciate the motivation behind NYPSC's suggestion, we cannot so limit our future rate determinations. Just as this Commission could not deter-

---

**59.** This is one of several concerns that have been raised that FPC incentive programs may have anticompetitive effects. *See Public Service Comm'n v. FPC,* 159 U.S.App.D.C. 172, 203–05, 487 F.2d 1043, 1074–76 (1973), *vacated and remanded for further consideration,* 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974) (contingent escalation's anticompetitive effect is "plain enough"); Note, Refund Beneficiaries and Refund Credits Under the Natural Gas Act, 41 U.Chi.L.Rev. 792, 812 (1974) ("[t]he refund credit option thus creates the possibility that efficient new competitors will be locked out of the market").

**60.** *See, e. g., Gulf State Utilities Co. v. FPC,* 411 U.S. 747, 758–59, 93 S.Ct. 1870, 36 L.Ed.2d 635

(1973); *Conway Corp. v. FPC,* 167 U.S.App.D.C. 43, 49, 510 F.2d 1264, 1270 (1975), *aff'd,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976); *City of Pittsburgh v. FPC,* 99 U.S.App.D.C. 113, 237 F.2d 741, 754 (1956). *See also FPC v. Texaco, Inc.,* 417 U.S. 380, 397–98, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (Natural Gas Act aimed at monopolistic forces controlling natural gas); 42 U.S.C. § 6213 (1976) (Energy Policy and Conservation Act provision controlling anticompetitive joint offshore leasing); 42 U.S.C.A. § 7112(12) (West 1977) (Department of Energy should "foster and ensure competition among parties engaged in the supply of energy and fuels"); 42 U.S.C.A. § 7152(b)(1) (West 1977).

mine the allowable amount of state production or severance taxes for inclusion in the allowed rate, similarly this Commission has no authority to determine the method or amount of lease payments to the Department of the Interior. While we are mindful of our responsibility not to allow unreasonable costs in our cost-based rate determination, we cannot arbitrarily conclude that lease acquisition costs beyond some set ratio are unreasonable without substantial and timely information.

The foregoing FPC analysis made in its ratemaking opinion does not relieve it of the responsibility to consider whether to provide an incentive for lease acquisition in optional certification. Optional certification is an exception to national ratemaking allowing higher rates to encourage exploration and development. It is not the prescribed channel for passthrough of producers' costs; [61] that is the function of national ratemaking. The elements of an optional certification incentive must be connected to incentive objectives. The fact that a lease has been arranged by another federal department is a matter for that department, and is not in and of itself reason for a special-exception program by the Commission. There is no indication that the Interior Department has put it forward that its leasing efforts require or depend on special provision for its lessees.

Moreover, in carrying out its functions, the FPC has been required when appropriate to give independent policy consideration to matters which are also the responsibility of other federal agencies. National antitrust policy is principally the responsibility of the Department of Justice and the Federal Trade Commission, yet the FPC is required to give its own independent consideration to competitive factors in its decisions. *See, e. g., Conway Corp. v. FPC*, 167 U.S.

App.D.C. 43, 49, 510 F.2d 1264, 1270 (1975), *aff'd*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976); *City of Pittsburgh v. FPC*, 99 U.S.App.D.C. 113, 126, 237 F.2d 741, 754 (1956), *cited with approval, California v. FPC*, 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). National environmental policy is the responsibility of many federal agencies yet the FPC is required to give its own independent consideration to environmental factors in its decisions. *See, e. g., Udall v. FPC*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). *See generally NAACP v. FPC*, 172 U.S.App.D.C. 32, 44, 520 F.2d 432, 444 (1975), *aff'd*, 425 U.S. 662, 668, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976). Conversely, because offshore leasing implicates the energy policy alternatives of many agencies, we have required the Department of the Interior to assess energy factors including FPC activity in its environmental statements on offshore leasing. *Natural Resources Defense Council v. Morton*, 148 U.S.App.D.C. 5, 15, 458 F.2d 827, 837 (1972); *cf. Continental Oil Co. v. FPC*, 370 F.2d 57, 67 (5th Cir. 1966) (leasing act does not block FPC offshore gas regulation). We need not consider how much weight the FPC may give to national leasing policy in ratemaking because it has not yet discussed the matter at all. We hold only that the FPC cannot abdicate its responsibility to give reasoned consideration simply because leasing involves another department.[62]

The initial statute providing for offshore leasing, the Outer Continental Shelf Lands Act of 1953, expressly staked out an FPC role in regulation of gas pipelines from the leased lands to take account of conservation.[63] Beyond that is the overriding requirement of regulation in the public interest, which can take account of national policy. As for any administrative difficulties of coordination, this did not justify a total lack of effort by the FPC in the past, and

---

**61.** Lease auctions were conducted for decades without there being any optional certification incentive program at all. It can hardly be contended that the lease statute commands that there be an incentive program.

**62.** The FPC and the Department of Interior have consulted with each other about offshore leasing and the optional certification program. Order No. 455, 48 FPC 218, 220 (1972); Order No. 455–A, 48 FPC 477, 481 (1972).

**63.** *See* 43 U.S.C. § 1334(c) (1970).

may be more tractable in the future, since the Department of Energy Organization Act makes the FERC part of the new Department of Energy which has inherited offshore leasing responsibilities.[64] That Department and the FERC will be in a position on remand to take an enhanced overview of the policy concerns to be coordinated here.[65]

Since the Commission has failed to give any consideration at all to pertinent factors, we must remand for further consideration. "In view of the absence of Commission analysis, we observe that our comments do not constitute implacable prohibition" against incentives for leasing; "[W]e have, however, identified substantial problems that the FPC will have to consider on remand." *Public Service Comm'n v. FPC, supra* note 59, 159 U.S.App.D.C. at 203, 487 F.2d 1043 at 1074.[66]

### III. CHALLENGES TO THE FPC'S FAILURE TO COORDINATE WITH NATIONAL RATEMAKING

■ The FPC has supplemented its national ratemaking program with a large number of ancillary producer incentive programs. Perhaps no other agency has ever assembled so large an array of incentive programs focused on a single objective.[67] The array consists entirely of extrapolations from the objectives of a statutory scheme which does not explicitly provide for any such programs. For the reasons we now set forth, the Commission is obligated by its creation of this large array of parallel programs to coordinate them with national ratemaking.

Pragmatically, the incentive programs require coordination in order to work. Incentive programs are justified only insofar as there is a connection between the incentive and the supply of new gas. The likelihood of such a connection diminishes to the extent the programs duplicate or conflict, both because of the diminishing returns on successive increments of incentive, and because producers which can choose among incentive programs will rationally seek those programs with the least stringent requirements of benefit to the public. If the FPC allows the connection between incentive and supply to become unjustifiably attenuated by lack of coordination, it has failed to give " 'reasoned consideration' to the shaping of its order in an effort to protect consumers from paying substantially more than necessary to bring forth the needed supplies." *Cities of Fulton v. FPC* 168 U.S.App.D.C. 33, 37, 512 F.2d 947, 951 (1975).

More fundamentally, coordination is required in the interests of justice. In *West Ohio Gas Co. v. Public Utilities Comm'n,* 294 U.S. 63, 71, 55 S.Ct. 316, 320, 79 L.Ed. 761 (1935), Justice Cardozo stated that a commission policy of using unexplained, inconsistent bases to prescribe sale prices for gas in two cities was "at variance with 'the rudiments of fair play.' " *See also Callanan Road Improvement Co. v. United States,* 345 U.S. 507, 513, 73 S.Ct. 803, 97 L.Ed. 1206 (1953); *Trans World Airlines, Inc. v. CAB,* 128 U.S.App.D.C. 126, 147, 385 F.2d 648, 669 (1967), *cert. denied,* 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968). Commissions must be as much on guard not to subject consumers to unexplained duplication or conflict in incentive approaches. The existence of a large array of uncoordinated incentive programs creates the impression

---

**64.** *See* 42 U.S.C.A. § 7152(b) (West 1977) (inherited leasing responsibilities).

**65.** The 1977 act provides channels for coordination of leasing. *See* 42 U.S.C.A. § 7140 (West 1977) (Leasing Liaison Committee); *id.,* § 7153(b) (consultation). *See generally* [1975] 5 Envir.Rep. (BNA) 1925 (competition instead of coordination before the 1977 act).

**66.** The Commission has a range of options to consider on remand. Rather than completely disallowing lease costs, it might return to its original standard in Order No. 455 for costs in optional certification and take lease acquisition cost findings in national ratemaking as conclusive (unless actual lease costs are lower) in optional certification. This would allow rate accounting to include average lease costs without providing extra incentive.

**67.** See p. —— of 191 U.S.App.D.C., p. 549 of 589 F.2d *supra.*

that "the incentive device . . . [is being] paraded before the courts in a number of guises," a "spectacle [viewed] with some skepticism." *Cities of Fulton v. FPC*, 168 U.S.App.D.C. 33, 36–37, 512 F.2d 947, 950–51 (1975). Ultimately, that appearance is inconsistent with the Rule of Law. If continued unchecked it would create an impression that the agency is engaging in an uncontrolled giveaway to the regulated companies without Congressional warrant, instead of protecting the public interest—and that the courts were abdicating their review responsibility.

We upheld the optional certification procedure in *Moss v. FPC, supra*, and gave the FPC what virtually amounted to a "blank check" to develop standards for the new program. Over the last six years, the Commission has failed to devote the necessary analysis and investigation to the proper filling of that blank check. As the Fifth Circuit has said, programs may be upheld on an experimental basis by "kid-glove" review during the period of their initial development. However, a "cautionary note should indicate that as experiment lapses into experience, the courts may well expect the Commission to justify its policies. . . ." *Shell Oil Co. v. FPC*, 520 F.2d 1061, 1072 (5th Cir. 1975), *cert. denied, California Co. v. FPC*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976), *quoted in The Second National Natural Gas Rate Cases*, 186 U.S. App.D.C. at 38, 567 F.2d at 1031.

A. *Coordination with the National Rate-making at the Level of the Whole Program*

New York contends that there is a fundamental inconsistency between the national ratemaking program, based on average costs, and the optional certification program, based on the individual costs of high-cost programs. On rehearing before the FPC, New York contended that "[t]he fact that Pennzoil's project costs are in excess of the nationwide norm is hardly a 'special circumstance'. Since the nationwide rates

are based on the producers' average costs . . . it is to be expected that approximately half the volumes produced will be at rates in excess of this level." [68] On appeal, New York elaborated: [69]

It would however appear to be lawful, though of doubtful practicality, to establish a pricing system under which all producer sales (or all sales of a particular producer) would be justified on a project cost basis . . .. Similarly, it is lawful to fix the just and reasonable rates for all producer sales on an area or nationwide basis reflecting primarily, if not exclusively, average producer costs. . . . However, the combination of the two cost techniques resulting from the Commission's action here is neither proper nor lawful.

As stated by New York, the Commission's present mixture of ratemaking standards presents the problem of double counting of high costs and single counting of low costs. When the same cost treatment approach is used in both national ratemaking and optional certification, there is no coordination problem. Both ratemaking procedures can use an average costs approach, so that all consumers pay for the average costs of high and low cost gas. Alternatively, both procedures can use a project cost approach, so that consumers of high cost gas pay high costs, and consumers of low cost gas pay low costs. However, when different cost treatment approaches are used in the two proceedings without coordination, then there is a double counting problem. Consumers of high cost gas pay high costs because the high cost projects received optional certification. Consumers of low cost gas pay an average of high and low costs because of national ratemaking. In sum, all consumers taken together end up paying more than the average of all costs: they pay double for high costs.

This is precisely the kind of problem which we warned in *Consumers Union* would have to be "reconciled" if the FPC

---

**68.** Petitioner's Application on Rehearing at 2, R. 1225.

**69.** Petitioner's Brief at 33.

changed from its Order No. 455 average costs standard to a project costs standard. 166 U.S.App.D.C. at 278, 510 F.2d at 658. This is also the kind of problem we recently noted twice in *The Second National Natural Gas Rate Cases.* There, we upheld an FPC scheme designed to keep consumers from paying through national ratemaking for gas they pay for in the advance payments program. 186 U.S.App.D.C. at 59–61, 567 F.2d at 1052–1054. We also warned it was "questionable" to make consumers pay through national ratemaking for gas they pay for in intrastate purchases. *Id.* at 58, 567 F.2d at 1051.

Pragmatically, there is no incentive value served by charging consumers through the national program for high costs covered by other mechanisms. More fundamental is the problem of inconsistency and unfairness. The Commission is free to change the standards in the optional certification program, but to do so it must give reasoned consideration to the effects of its change. We hold that on remand, the FPC must give such consideration to how best to coordinate the optional certification program with national ratemaking in order to reconcile the inconsistencies set forth herein.[70]

B. *Coordination With National Ratemaking at the Level of Individual Applications*

▉ Pennzoil and United originally submitted their application for an optional certificate at a rate of 47 cents per Mcf. Following the FPC's remand for findings of the actual project costs, they "amended" their application to seek a rate of 80 cents per Mcf. Although the FPC refused to allow them to collect the "amended" rate

during the pendency of the action, it certified the 80 cent rate in its final order.

New York vigorously protests the FPC's approval of the Pennzoil amendment. The FPC and Pennzoil respond that the approval was justified both by the facts of the case and by FPC precedent. Our prior analysis indicates that there will be a need to reassess the facts of the case on remand, and we do not find the weight of FPC precedent to support approval of the amendment. Therefore, we deem it appropriate to outline the factors requiring further consideration of the approval, leaving initial decision on the new factual background of the case to the Commission.

As we have discussed, the Commission must attempt to coordinate optional certification with national ratemaking at the level of the whole program, particularly with respect to double counting of high costs. For much the same reasons, the Commission must attempt to coordinate optional certification with national ratemaking at the level of individual applications, so that individual producers do not reap the benefits of both procedures.[71]

In contending that there was precedential support for allowing this amendment, the Commission cited only one Commission action, which—like the decision before us— was barren of explanation of why amendment should be allowed.[72] In contrasting spirit are the well-reasoned orders, regulations and rulings—affirmed on appeal, when tested—that declined to allow a higher price, stating that such an amendment of an optional certificate application (to allow a higher price) secures no new benefit for the public while conferring a new benefit

---

**70.** One obvious method of reconciliation is the approach used in Opinion 770–A for advance payments of including some credit in national ratemaking for the costs paid by consumers through optional certification.

**71.** The most common situation in which lack of coordination can produce conflicting or duplicating incentives is when a producer attempts to take advantage of two overlapping programs at once. The FPC has steadfastly blocked such attempts where the programs were optional certification and national rate making, see pp.

————— of 191 U.S.App.D.C., p. 562 of 589 F.2d *infra.* Other examples include *Mitchell Energy Corp. v. FPC,* 519 F.2d 36 (5th Cir. 1975) (special relief program); *Cities of Fulton v. FPC, supra,* 168 U.S.App.D.C. at 40, 512 F.2d at 954 (investment plowback); *The Second National Natural Gas Rate Cases, supra,* 186 U.S. App.D.C. at 61, 517 F.2d at 1054 (advance payments).

**72.** *The Rodman Corp.,* 51 FPC 1548 (1974).

on producers.[73] For a short period, the FPC allowed producers applying under the optional procedure to receive the subsequently issued national rate if the producer could satisfy certain difficult criteria. Pennzoil asserts here that it "would have met the criteria."[74] Even assuming this, the FPC by its nationwide ratemaking has apparently abolished the route by which producers could obtain the national rate.[75] This action reinforces the previous barriers against amendatory rate hikes.[76]

The simple answer the courts have given in upholding this "steadfast"[77] FPC policy has been that amendments are an attempt to get the benefits of two distinct procedures, the optional procedure and the national ratemaking procedure. Producers reap an immediate benefit from filing under the optional procedure: after a nine month period of gestation, they can commence collecting the rate specified in their optional application instead of the national rate. Once they have filed for this benefit, they cannot also ask for the benefit of subsequent developments the way an applicant under the national ratemaking procedure can. "A producer may benefit by one procedure, or the other, but not both." *Ecce, Inc. v. FPC*, 526 F.2d 1270, 1275 (5th Cir.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976). Accordingly, we remand for further and reasoned consideration by the Commission of whether and under what conditions amendment of the optional certificate application may be allowed.

## V. CONCLUSIONS

The FPC created the optional certification program as an exception to national ratemaking to give greater security and

---

73. *See, e. g., Pennzoil Offshore Gas Operations, Inc. v. FPC*, 560 F.2d 1217 (5th Cir. 1977); *Ecce, Inc. v. FPC*, 526 F.2d 1270 (5th Cir.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976). Both affirmed FPC orders from previous years. *Accord, Texas Gas Exploration Corp.*, 52 FPC 767, 770–71 (1974), *aff'd without published opinion*, 183 U.S.App.D.C. 129, 561 F.2d 1022 (1977).

74. Intervenor's Brief at 17 n.14. While not decisive, it is obviously significant in weighing the appropriate policy considerations to consider whether producers who have commenced an optional certification procedure would be allowed to leave it and obtain the national rate.

75. Compare 18 C.F.R. § 2.56(a) (1977) with 18 C.F.R. § 2.56(a) (1976). The change is explained in Opinion 770–A, 41 Fed.Reg. at 50201.

76. There are two reasons why our decision requiring the FPC to allow amendment of a contract in *Mobil Oil Corp. v. FPC*, 187 U.S. App.D.C. 112, 570 F.2d 1021 (1978), is inapplicable to this case. First, and most important, unlike the contract in *Mobil*, the contract here contained no affirmative provision for amendment. Indeed, it could not, for such a provision would be inconsistent with the regulations of the optional procedure. Second, the contracting parties in *Mobil* had not received the benefits received by applicants under the optional procedure. It is the receipt of these benefits which prevents the applicant under the optional procedure from changing contracts or dropping out of the procedure as it wishes.

77. Daniel, *supra* note 28, at 802. In this area, the FPC's policies have been consistent from the beginning. In its original Order No. 455, 48 FPC at 229, and again on reconsideration, Order No. 455–A, 48 FPC at 483, the FPC refused to allow inclusion in optional certificate applications of "areawide rate clauses" which would *automatically amend applications or certificates* to raise rate levels. We affirmed the FPC's reasoning. *Moss v. FPC, supra*, 164 U.S. App.D.C. at 9, 502 F.2d at 469–71. Strictly speaking, in this case the producer's requested amendment was different from the type that has been explicitly prohibited. The requested amendment was to a specific higher rate rather than to the current area or national rate. We do not find this difference material.

The dissent suggests that Pennzoil's amendment was justified because "[p]resumably no question would be raised if Pennzoil had cancelled the contract, withdrawn its application, *see* 18 C.F.R. § 2.75(n) and then submitted a new contract and a new application." However, in an analogous case, it was held that lawyers' gambits based on loopholes in the phrasing of 18 C.F.R. § 2.75 would not be permitted to override the overall intent and policy behind the optional program. *See Pennzoil Offshore Gas Operators, Inc. v. FPC*, 560 F.2d 1217, 1220 (5th Cir. 1977); notes 74, 76 *supra*. Whether the hypothesized legal sleight-of-hand would be permitted, and its bearing on what Pennzoil did in this case, are matters best left to the Commission to consider on remand.

higher rates to producers as an incentive for increased exploration and development. In 1974 we gave the FPC broad latitude to develop appropriate standards for the program. Since 1974, we have not seen expanded or refined analysis by the FPC of how to make the program work. Instead, if anything, the FPC retreated from its earlier attempts at analytically justifying its standards, and essentially lapsed into "kid glove" acquiescence to the desires of natural gas producers. The issue in this case has not been whether there will be an optional certification program, but how the program's standards can be coordinated with its objectives and other programs.

If we understand Pennzoil's position, it wants assurance that its high-cost, unsuccessful wells will have the benefit of a special provision to recapture costs. This assurance is supposed to be provided to it even though the high costs of those wells have already raised the prices paid for gas from low-cost wells (because the prices for gas from low-cost wells are determined on an areawide average that includes high, as well as low costs). To accept this position requires consideration not given by the Commission, and we remand for the further consideration that will provide assurance that the matter has been taken into account, with whatever explanation and adjustment the Commission, in its discretion, considers appropriate.

Our action does not intrude into the administrative domain. We do not dictate policy to the Commission, *see FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 2120, 56 L.Ed.2d 697 (1978), nor do we interfere with the Commission's fashioning of its own procedures, *see Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460, 479 (1978). We are only saying that its action did not reflect the consideration of relevant factors that is required by law. That this is a continuing function of appellate court review is reaffirmed by the remand to this court in *Vermont Yankee* for a determination of whether the agency's action was arbitrary. As the Court said in that case,

there "remains, of course, the question of whether the challenged rule finds sufficient justification in the administrative proceedings that it should be upheld by the reviewing court. . . . 'If [a] finding is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [it] for further consideration.'" *Vermont Yankee, supra,* 435 U.S. at 549, 98 S.Ct. at 1214, 55 L.Ed.2d at 482–83, *quoting Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

We recognize that the optional certification program is in large part an experiment. We accept and encourage pragmatic and flexible approaches by the FPC to the conduct of that experiment. This opinion has identified a number of respects in which the Commission has failed to give reasoned consideration to the standards it promulgated. On remand, the FERC will have the responsibility—and the opportunity—to supply that consideration, and to coordinate the program in the manner appropriate to the nation's need for new natural gas supplies at reasonable rates.

This case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

ROBB, Circuit Judge, dissenting:

The majority argues that without adequate explanation the Commission has allowed producers to use the optional procedure to recover project costs that are higher than the national rate. National ratemaking, says the majority, "already takes care of high cost projects; producers are reimbursed for such projects by their inclusion in the national average cost base. Optional certification would reimburse producers a second time, directly, for the same high cost projects, without any coordination with national ratemaking. There is thus a plain risk of 'double counting'—billing consumers twice for the same high costs. The FPC has not provided any justification for a double burden on the consumer." (Maj. Op. at —— of 191 U.S.App.D.C., at 545 of

589 F.2d) The Commission is also faulted for failure to justify the conclusion that the allowance of Pennzoil's costs, including the cost of leases, would be an incentive to increase the gas supply. The majority remands the case to the Commission with instructions to give "reasoned consideration" to these matters. In my opinion however the questions and objections raised by the majority are subsumed by the Commission's orders establishing the optional procedure, which were approved by this court. 18 C.F.R. § 2.75; Order No. 455, 48 F.P.C. 218; Order No. 455A, 48 F.P.C. 477; *Moss v. FPC*, 164 U.S.App.D.C. 1, 502 F.2d 461 (1974), *rev'd in part*, 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976).

As we recognized in *Moss v. FPC* the Commission in its orders contemplated that applications for certification under the optional procedure would be considered "notwithstanding that the contract rate may be in excess of an area ceiling rate established in a prior opinion or order of this Commission." 18 C.F.R. § 2.75e, 164 U.S.App.D.C. at 13, 502 F.2d at 473. We recognized further that although in general the cost findings embodied in area rate decisions would be accepted, applications would be subject to hearings at which those cost findings might be challenged. Project costs would be allowed if shown to be justified by special circumstances. Order No. 455A, 48 F.P.C. 477, 478–79; 164 U.S.App.D.C. at 6–7, 502 F.2d at 466–67. This principle has been followed by the Commission in applying Order No. 455. Thus in *McCulloch Oil Corp.*, 52 F.P.C. 1430 (1974) the Commission said:

In the present proceeding McCulloch has introduced cost evidence relating to the five wells it has drilled in the Olson Prospect, Ellis County, Oklahoma. As will be developed, the Judge employed these project cost figures in determining that the proposed price was just and reasonable. The staff, on the other hand, concluded that project cost data is not a proper evidentiary basis for the approval of a Section 2.75 application. It said that to submit such data would make Order No. 455 more of an insurance policy rather than an example of responsible rate-making, for the applicant would use project costs or nationwide costs, whichever are the higher. APGA agreed with the staff that project costs should not be used. On the other hand, McCulloch contended that an optional price proceeding must be flexible and should not be confined to one type of cost.

In Order No. 455, Statement of Policy Relating to Optional Procedure for Certificating New Producer Sales of Natural Gas, 48 FPC 218 (18 CFR 2.75) issued August 3, 1972, we stated (*Id.* 229):

We believe that each contract filed under the alternative procedure must be considered on the merits of the terms and provisions within each contract. There certainly must be some evidentiary basis proferred by the seller-applicant upon which we can judge whether the contract rate is just and reasonable. We will, absent a showing of special circumstance, accept as conclusive the cost findings embodied in our area rate decisions, as such may be supplemented from time to time by appropriate Commission order.

As we indicate in Order No. 455 cost evidence is indispensable for the determination of just and reasonable rates as a basis of comparison and point of departure. *City of Detroit, Michigan v. F.P.C.*, 230 F.2d 810, 818 (CADC–1955), *certiorari denied*, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956). Area cost evidence would, of course, be found in the area rate decisions, but in accordance with the language above from Order No. 455, if a producer claims costs higher than those found in the applicable area determination he is required to make a showing of special circumstance. In our opinion, as we said in *William A. Jenkins, et al*, 52 FPC 873, Docket Nos. CI75–119 and RI75–5 and earlier cases, a showing of project costs should properly be deemed to constitute the "special circumstance" to be considered together with all other material evidence which would support a finding of a just and reasonable rate in

excess of the applicable area rate. It follows, as *Jenkins* says, that "the seller-applicant may introduce relevant evidence of the cost of the particular project for which certification is sought".

(52 F.P.C. 1431–32) [Footnote omitted].

My conclusion from what has been said is that the policies underlying the optional procedure about which the majority complains were fixed by Orders 455 and 455A, and are not open to attack now. Pennzoil's application on its face qualified for consideration under the optional procedure. The Commission need not hold an evidentiary hearing for each producer to test the validity and applicability of the rule. *See, e. g., Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, (1968).

The 80¢ rate approved by the Commission was supported by the evidence. Pennzoil's testimony was that its project cost was $1.649 per Mcf, including a 15% rate of return. The Administrative Law Judge found that the cost after eliminating eight years retroactivity on the return allowance was $1.0148 and this finding is not seriously challenged by the petitioner New York Public Service Commission. I note also that the national rate at the time briefs were filed in this court was $1.01 per Mcf, and that Pennzoil's contract would have qualified for that rate had Pennzoil not obtained its optional certificate.

The majority would also require the Commission to give further consideration to Pennzoil's amendment of its application for an optional certificate. I see no reason to question the Commission's action in this regard. The contract originally submitted by Pennzoil provided for a rate of 47¢. Because of a change in economic conditions however Pennzoil became unwilling to sell at that price and informed the buyer that it desired to cancel the contract. This Pennzoil had a right to do. 18 C.F.R. § 2.75(n). Not wishing to cancel however the buyer agreed to increase the price to 80¢ and the contract and the application were amended accordingly. (J.A. 57) I do not see anything irregular, or that needs explanation, in this procedure. Presumably no question would be raised if Pennzoil had cancelled the contract, withdrawn its application, *see* 18 C.F.R. § 2.75(n) and then submitted a new contract and a new application.

In conclusion I respectfully suggest that the majority opinion concerns itself with matters of policy, which are the business of the Commission and not of this court, and which were settled by the Commission when it established the optional procedure. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 98 S.Ct. 1197, 1218–19 (1978); *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 2120, 56 L.Ed.2d 697 (1978); *Action for Children's Television v. FCC,* 183 U.S.App. D.C. 437, 460–61, 564 F.2d 458, 481–82 (1977).